UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THOMAS B. CAPOLA,                    :
    Plaintiff                         :
                                      :
V.                                   : CASE NUMBER: 3:08-CV-00562(AWT)
                                      :
CHRIS FARRAR and                     :
VELOCITY COMMERCIAL                  : JULY 9, 2008
CAPITAL, LLC                         :
    Defendants                        :
                                      :

## PLAINTIFF'S AMENDED COMPLAINT

### FACTS

1.    Plaintiff, Thomas B. Capola ("Plaintiff") is a resident of the City of Weston in the State of Connecticut.

2.    Defendant, Velocity Commercial Capital, LLC ("VCC") is a limited liability corporation with its principal place of business in Westlake Village, California and operates an office in Stamford, Connecticut. VCC is a Small Balance Commercial Lender with approximately fifty employees.

3.    Defendant, Chris Farrar, ("Farrar") is a resident of the state of California and is the President and CEO of VCC which operates an office in Stamford, Connecticut.

4.    In the late winter of 2003 Farrar requested that Plaintiff assist him in raising capital to fund VCC, which had not yet been

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

1

formed. There was no formal written agreement between Plaintiff and Farrar for Plaintiff to secure such financing but there was an oral agreement and understanding.

5.     On or about April 2004, Defendant, Chris Farrar, approached Plaintiff about the possibility of opening and managing the east coast operations of VCC.

6.     In the spring of 2004, Farrar secured a $17.5 million credit facility with Foothill Capital, a wholly owned subsidiary of Wells Fargo Wholesale Banking (a division of Wells Fargo Bank), upon the condition that VCC raises an additional $4 million in equity or debt no later than October 31, 2004.

7.     VCC began business in California in July 2004 with four employees: Jeff Taylor who was given 3.5% equity, Richard Herrin who was given 3.5% equity, Jack Sutton, and Chris Farrar, who was a 90% equity holder.  Several other individuals each owned small minority positions for a total of approximately 3% of the equity.   As of this time, Farrar had not yet raised the additional $4 million in capital required by Foothill Capital.

8.     Farrar was able to raise $2 million, including some of his own assets and those of two other investors which left him $1.7 million short of the $4 million required by Foothill Capital. Farrar approached Plaintiff and indicated he would give Plaintiff equity in the

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

2

company if Plaintiff raised the additional $1.7 million dollars Farrar needed in order to fund operations of VCC and keep the company open and operable.

9.    In October of 2004 Plaintiff and Farrar agreed that Plaintiff would receive a 15% equity position in VCC for raising the additional $1.7 million, for finding a large institutional partner to make a significant equity investment in VCC, and for getting the east coast operations to cash flow break even, giving him 5% for each task.

10.    Plaintiff raised the $1.7 million prior to the October 31, 2004 deadline set by Foothill Capital. Farrar and Plaintiff agreed that Farrar would build the California office and get the company running while Plaintiff worked on the technology, location and staffing of the Connecticut office, and finding an institutional partner.

11.    In October of 2004, the structure of VCC included ninety percent ownership to Farrar, with the promise that Plaintiff would own 15% of the diluted equity in the business[1]. In October 2004, Farrar terminated Richard Herrin, the chief operating officer of VCC, assuring Plaintiff at that time that he would be provided the equity he was promised in VCC.

12.    In October, 2004, Plaintiff began performing the tasks agreed upon, namely developing the technology for the company,

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

---

[1] Whenever new capital is raised and equity is given to a new investor, all previous investors are diluted pro rata.

3

finding a large institutional investor and laying the groundwork for the opening of the Connecticut office.

13. Throughout the fall of 2004 and through the spring of 2005, Plaintiff contacted dozens of potential investment partners including, but not limited to Hedge Funds, private equity firms, investment banks, private investors and life insurance companies. A company by the name of Credit Based Asset Servicing and Securitization, LLC ("CBASS") from New York was one of the firms solicited by Plaintiff. CBASS eventually became the investment partner in VCC.

14. As Plaintiff was working full time on VCC business he requested that he be put on the VCC payroll. Plaintiff requested $5000.00 per month or $60,000.00 a year to cover his bills but only up until the Connecticut office was open and profitable, at which time he was to receive $100,000.00 per year, the same amount the other executive vice president located in VCC's California office received.

15. In reliance upon salary and equity promised, Plaintiff terminated all other employment, including work for a billion dollar client as well as closed his investment company, which he had operated for almost three years and from which he earned significant income.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

4

16.     Plaintiff became a full time employee of VCC in February, 2005.

17.     In March 2005, Plaintiff and Farrar met with potential investors including CBASS at which time, Farrar announced that Plaintiff and Farrar were seed equity owners, with Farrar as the majority and Plaintiff and Jeff Taylor as minority owners.

18.     An agreement was entered into with CBASS as the final investor in VCC effective July 12, 2005. CBASS invested three million dollars cash for thirty percent of VCC's outstanding, fully diluted shares.

19.     At this time, steps were taken by Plaintiff, Farrar and CBASS to insure that Farrar was permitted pursuant to the operating agreement to transfer fifteen percent of the fully diluted shares to Plaintiff once the Connecticut office was open, operational and cash flow positive. Specific carve outs were added to the operating agreement that permitted Farrar to transfer a large portion of his share of the equity to an unrelated third party after the CBASS transaction. This carve out was designed to transfer equity to the Plaintiff.

20.     Plaintiff opened the Connecticut office on or about July 1, 2005.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

5

21. Farrar sent Plaintiff a copy of the amended operating agreement, which listed Plaintiff as a Senior Vice President, not as an Executive Vice President and Plaintiff, requested that this error be corrected. **Exhibit 1**. Farrar indicated that he would address the issue at the next board meeting to have it changed, which up until the date of Plaintiff's termination, never occurred.[2]

22. Shortly after the Connecticut office was opened Farrar sent Neil Beldock ("Beldock") to Connecticut to assist in training the sales force. Beldock had a different sales training approach than the Plaintiff and undermined his authority as well as the policies Plaintiff had instituted.

23. In addition, Mr. Beldock was processing loans that were outside of industry and VCC's guidelines. Plaintiff demanded that Farrar remove Beldock from the Connecticut office and send him back to California. This did not occur.

24. In November 2005 the Securities and Exchange Commission began an inquiry into a loan made by Joe Cowell and Braddock, LLP and issued a subpoena to VCC for certain records. Plaintiff insisted that Farrar disclose the existence of the subpoena to CBASS, which he failed to do. These charges were later cleared by the SEC. **Exhibit 2.**

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

---

[2] Plaintiff executed leases, technology contracts, retained counsel, signed email and all corporate correspondence as an EVP.

6

25. A new team structure was instituted in California by Beldock in which the team leader, Zach Murphy received a percentage of the profit on all loans. Beldock instituted the same policy in Connecticut, which Plaintiff dissolved in December 2005, to insure there were no improper profits being collected on the loans being closed.

26. Plaintiff began to question the operations of the California office in December 2005. Loans were being closed that were incomplete or potentially fraudulent. He informed all staff that no loans in Connecticut would close without his approval.

27. The Connecticut office became cash flow break even in January 2006. It also had a higher closing ratio and higher conversion ratio than the California office.

28. In February 2006, Plaintiff again demanded that Beldock be removed from the Connecticut office for the following reasons: he came to work on a sporadic basis, was convicted of driving while intoxicated, came to work hung over and used drugs while in the office.

29. In addition, in February 2006, Plaintiff spoke to Farrar about Beldock funding loans, with Farrar's approval that did not meet industry, federal nor state guidelines and informed Farrar that if

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

7

Farrar did not disclose this fact to CBASS, Plaintiff would make such disclosure and would find another capital partner.

30. In February 2006, Plaintiff noticed that his office was continually rummaged through at night and he began locking his office door. Specifically, he noticed that papers that he'd leave on his desk the night before were moved and drawers were not the way he left them the night before. He began to lock his door at night to try to prevent this.

31. Beldock left the Connecticut office and went back to California in February 2006.

32. In March 2006, Plaintiff again pressed Farrar about his equity position and his raise, as Plaintiff had complied with all of the conditions in accordance with their agreement.

33. In March 2006, Beldock announced that two California employees, Zach Murphy and Hannah Murphy (brother and sister), would be transferred from California to Connecticut and that all files would be pre-underwritten and then simply rubber stamped by VCC's underwriter. This was stated in an email and sent to all employees.

34. In March 2006, Plaintiff received a telephone call from Michael Mutlu, a mortgage broker, who informed him that Beldock had negotiated a kickback of the broker's fee with him. Plaintiff reported this to Farrar. Farrar failed to take any action relative to

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

8

Beldock, who was now back in the California office, for improper behavior. Plaintiff also insisted that Farrar inform CBASS of this situation under Farrar's fiduciary duty to CBASS. Farrar never did so.

35. In April 2006, Plaintiff again requested a copy of the operating agreement as well the transfer of his portion of the agreed upon equity. Farrar promised to provide the documents and assured Plaintiff that the 15% equity would be transferred to him.

36. In July 2006 Zach and Hannah Murphy were finally transferred to the Connecticut office and Beldock announced that he would be moving to Connecticut permanently.

37. During July 2006, subsequent to the arrival of Zach and Hannah Murphy, Plaintiff discovered that Zach Murphy requested the Connecticut VCC closing department to close a loan that had not been approved by the Connecticut underwriter and withdrawn from the loan pipeline by Plaintiff. When Plaintiff confronted Mr. Murphy, he stated he worked within the VCC building but had the right to operate as a separate entity and that he reported only to Farrar and did not have to comply with VCC policy and procedure.

38. During July 2006, Plaintiff had numerous discussions with other people at VCC's Connecticut office about points being charged, changes being made to closing packages after they have been approved by underwriting, changes being made at the closing table

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

9

with and without the closer's approval, and some employees
negotiating closing conditions with brokers and borrowers and not
disclosing it on the closing documents, miscellaneous fees being
added that could not be explained and fees that were not permitted to
be collected.

39. As of July 2006 there were three employees in the
Connecticut office that were working unsupervised: Zach and Hannah
Murphy and Neil Beldock. They worked outside the boundaries of
company guidelines with Farrar's knowledge and endorsement. Loans
were being approved by Farrar which were not complete. They were
collecting large fees on loans against company policy while the other
employees under Plaintiff's direction followed company procedures.
Plaintiff attempted to supervise the Murphy's and Beldock while they
were in the Connecticut office; however, Farrar took the authority to
do so away from Plaintiff.

40. Plaintiff noticed that the same two employees, Zach and
Hannah Murphy, were answering VCC phones "Southeast Mortgage
Partners" which he believes they were operating on VCC's time and
money. **Exhibit 3.**

41. In August 2006, an employee by the name of Barbara Smith
informed Plaintiff that she was suspicious of certain company
employees and had seen data changed in the system. Plaintiff

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 483-4070
JURIS NO. #35870

10

thereafter discussed with Farrar the possibility that VCC was processing files that were being closed at Southeast Mortgage partners. Farrar promised to check into it but never responded to Plaintiff.

42. In August 2006, Plaintiff discovered that the approved closing confirmation on the loans originating from Zach Murphy did not match with the final closing package. Plaintiff was informed by the underwriter that the reason for this was because Mr. Murphy was changing points and fees after underwriting had approved the loan, all with Farrar's knowledge. This violated the policies established by the Connecticut office.

43. In September 2006, Plaintiff met with Farrar to discuss problems at VCC and to explain his plan for revising office policies. During the meeting Plaintiff again reminded Farrar that his salary had not been increased as promised by Farrar and that his equity had not yet been transferred as also promised. In addition, Plaintiff informed Farrar that the actions of the Murphy's and Beldock were probably illegal and he demanded that they be removed from the office. Finally, Plaintiff again told Farrar that Farrar was in violation of the current VCC operating agreement for failure to inform CBASS of the SEC subpoena, of rebates/kickbacks and Plaintiff's suspicions concerning

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

11

VCC employees and Southeast Mortgage Partners. Farrar agreed to inform CBASS at the next meeting.

44. In September 2006, Plaintiff instituted a new policy in the Connecticut office to enhance and define the loan approval process and correct the lax procedures pursued by the Murphy's and Beldock in underwriting. This resulted in a revised structure where Plaintiff instituted a series of checks and balances throughout the origination, processing and closing departments to insure integrity of the files being securitized prior to being sold as securitization packages.[3]

45. Plaintiff informed Farrar that he was going to announce the new Connecticut policies on October 30, 2006 to correct the issues of data being manipulated, changed and deleted and entire files being shipped and received without his approval. Plaintiff also informed Farrar that Hannah and Zach Murphy were illegally closing VCC loans at Southeast Mortgage Partners and being compensated by both companies. Farrar dismissed and denied this allegation.

---

[3] Securitization is a structured finance process in which assets, receivables or financial instruments are acquired, classified into pools, and offered as collateral for third-party investment. It involves the selling of financial instruments which are backed by the cash flow or value of the underlying assets. Securitization typically applies to assets that are illiquid (i.e. cannot easily be sold). It is common in the real estate industry, where it is applied to pools of leased property, and in the lending industry, where it is applied to lenders' claims on mortgages, home equity loans, student loans and other debts.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

12

46. Plaintiff was suspended with pay on October 30, 2006 and terminated on December 16, 2006.

## COUNT ONE: BREACH OF CONTRACT V. VCC

47. Plaintiff realleges and incorporates by reference paragraphs 1-46.

48. After negotiations, the parties entered into an oral agreement for employment on or around October 2004. The terms of that agreement were that Plaintiff was to receive fifteen percent of the fully diluted shares as well as a pay increase from $60,000.00 to a minimum of $100,000.00 once the Connecticut office was open, operational and cash flow positive. This was all accomplished in January 2006.

49. Plaintiff, despite numerous attempts to obtain same never had his salary raised or received equity in the company.

50. Plaintiff suffered a loss of income as a result, income he was promised prior to accepting employment by the Defendants.

## COUNT TWO: BREACH OF CONTRACT V. FARRAR

51. Plaintiff realleges and incorporates by reference paragraphs 1-50.

52. After negotiations, the parties entered into an oral contract for employment on or around October 2004. The terms of that contract were that Plaintiff was to receive fifteen percent of the fully

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

13

diluted shares once the Connecticut office was open, operational and cash flow positive. This equity share was promised to Plaintiff orally and via email directly from Chris Farrar, the President of VCC.

53. This was accomplished in January 2006. In addition, Plaintiff's salary was to be raised from $60,000 to a minimum of $100,000.00 per year once the Connecticut office was open, operational, cash flow positive and investment funds received. These tasks were accomplished in January 2006 but Plaintiff did not receive the pay increase.

54. Despite numerous requests by the Plaintiff to obtain same, Farrar never increased Plaintiff's salary nor gave him the equity he was promised in the company. As President and CEO, Farrar had the authority to increase Plaintiff's salary and distribute the equity. As a result of Farrar's failure to do so, Plaintiff suffered a loss of income, income he was promised prior to accepting employment by the Defendant.

## COUNT THREE: WRONGFUL TERMINATION - VIOLATION OF PUBLIC POLICY V. FARRAR

55. Plaintiff realleges and incorporates by reference paragraphs 1-54.

56. Plaintiff as an equity partner in the company should have felt free to act in the best interests of the company, its investors and clients without the threat of losing his job. He did, however, express



THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

14

his concerns relating to the improper operations of the company
endorsed by Farrar and was wrongfully terminated as a result.

57.     Plaintiff was unable to report the Defendant's violations to
an outside agency prior to termination and in fact was terminated
prior to his being able to do so.

58. As a further result, Plaintiff has and will suffer economic
damages.

## COUNT FOUR: WRONGFUL TERMINATION - VIOLATION OF PUBLIC POLICY V. VCC

59.     Plaintiff realleges and incorporates by reference paragraphs
1-58.

60.     Plaintiff as an equity partner in the company should have
felt free to act in the best interests of the company, its investors and
clients without the threat of losing his job. He did, however, express
his concerns relating to the improper operations of the company
endorsed by Farrar and was wrongfully terminated as a result.

61.     Plaintiff was unable to report the Defendant's violations to
an outside agency prior to termination and in fact was terminated
prior to his being able to do so.

62. As a further result, Plaintiff has and will suffer economic
damages.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

15

## COUNT FIVE: DEFAMATION: LIBEL AND SLANDER V. FARRAR

63. Plaintiff realleges and incorporates by reference paragraphs 1-62.

64. Farrar sent other employees within the company emails indicating that the ongoing SEC investigation and issues that had arisen as the result of the dealings of the company and indicated they were the result of actions taken by Plaintiff prior to and during the time he became employed by Defendant. As a direct result, Plaintiff's reputation suffered injury. **Exhibit 4.** Plaintiff was subsequently cleared of all SEC claims made by Velocity and Farrar.

65. Defendant, both orally and by written email published to the entire company, told other employees that the attorney hired for the SEC investigation was actually a federal investigator and that Plaintiff was in a lot of trouble. They were also told that Plaintiff had committed serious crimes (embezzlement) and would be going to jail. **Exhibit 4.**

66. In the termination letter sent to Plaintiff **(Exhibit 5),** Defendant claimed Plaintiff improperly removed a computer from VCC and that he deleted 6,000 emails and files from it. It is clear after an investigation by a company hired by Plaintiff that there were no files removed; it is clear that Defendant made these statements knowing

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

16

they were false. The computer at issue was Plaintiff's personal property. **Exhibit 6.**

67. The false statements were made both verbally and in writing; therefore, Defendant is liable to Plaintiff for both libel and slander.

68.Defendant made these statements, both verbally and in writing, with actual malice against the Plaintiff, with the knowledge that they were false and did so with improper motives.

## **COUNT SIX: DEFAMATION: LIBEL AND SLANDER V. VCC**

69. Plaintiff realleges and incorporates by reference paragraphs 1-68.

70. Farrar, as an agent of VCC, sent to other employees within the company emails indicating that the ongoing SEC investigations and issues that had arisen as the result of the dealings of the company, were the result of actions taken by Plaintiff prior to and during the time he became employed by Defendant. As a direct result, Plaintiff's reputation suffered injury. Plaintiff was subsequently cleared of all SEC claims made by Velocity and Farrar. **Exhibit 2.**

71. Defendant, both orally and by written email published to the entire company told other employees that the attorney hired for the SEC investigation was actually a federal investigator and that Plaintiff



THE **MARCUS LAW FIRM**
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

17

was in a lot of trouble. They were also told that Plaintiff had
committed serious crimes and would be going to jail.

72. In the termination letter sent to Plaintiff **(Exhibit 5)**,
Defendant claimed Plaintiff improperly removed a computer from VCC
and that he deleted 6,000 emails and files from it. It is clear after an
investigation by a company hired by Plaintiff that there were no files
removed; it is clear that Defendant made these statements knowing
they were false.

73. The false statements were made both verbally and in
writing; therefore, Defendant is liable to Plaintiff for both libel and
slander.

74. Defendant made these statements, both verbally and in
writing, with actual malice against the Plaintiff, with the knowledge
that they were false and did so with improper motives.

### COUNT SEVEN: CONVERSION AND STATUTORY THEFT V. FARRAR

75. Plaintiff realleges and incorporates by reference paragraphs
1-74.

76. Plaintiff purchased with his personal funds a server and a
work station (desktop) for VCC's use. Numerous attempts and
requests for repayment and/or the return thereof failed; therefore,
upon termination, Plaintiff had the right to the return of the server.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

18

77. Upon Plaintiff's termination, he requested numerous times, in writing, all of his personal possessions, including one of his personal servers from the Stamford, Connecticut office. **Exhibit 7**. This server was wiped completely clean; from all the data to the operating system. **Exhibit 6.** In addition to conversion of Plaintiff's personal property, this was in direct violation of an SEC subpoena and a direct request from Plaintiff's then attorney to preserve all of the data on this server.

78. Other personal items which Plaintiff left at the Stamford office following his termination were destroyed, including his personal family photographs, personal and business check books. Witnesses saw these documents being shredded, purged and removed from Plaintiff's office by agents of the Defendants.

79. Witnesses saw employees of the Defendants rip documents and carry boxes out of Plaintiff's office and into the parking garage, i.e. out of the entire building. **Exhibit 8.**

80. Defendant intentionally destroyed Plaintiff's property that he was forced to leave behind after his termination. These items were requested, in writing, however, Defendant failed to return same, to the exclusion of the owner's rights. Farrar and VCC kept one of Plaintiff's computers and personal property including check books and family photos which were ultimately destroyed.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

19

81. Defendant is liable to Plaintiff for conversion and statutory theft of his personal property by intentionally deleting the hard drive of his computer which he was forced to leave behind after he was terminated.

## COUNT EIGHT: CONVERSION AND STATUTORY THEFT V. VCC

82. Plaintiff realleges and incorporates by reference paragraphs 1-81.

83. Plaintiff purchased with his personal funds a server for Defendant's use. Numerous attempts and requests for repayment and/or the return thereof failed; therefore, upon termination, Plaintiff had the right to the return of the server.

84. Upon Plaintiff's termination, he requested numerous times, in writing, all of his personal possessions, including one of his personal servers from the Stamford, Connecticut office. **Exhibit 7**. This server was wiped completely clean, from all the data to the operating system. **Exhibit 6.** In addition to conversion of Plaintiff's personal property, this was in direct violation of an SEC subpoena and a direct request from Plaintiff's then attorney to preserve all of the data on this server.

85. Other personal items which Plaintiff left at the Stamford office following his termination were destroyed, including his personal family photographs, personal and business check books. Witnesses

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

20

saw these documents being shredded and purged and removed from Plaintiff's office by agents of the Defendants.

86. Witnesses saw employees rip documents and carry boxes out of Plaintiff's office and into the parking garage, i.e. out of the entire building. **Exhibit 8.**

87. Defendants intentionally destroyed Plaintiff's property that he was forced to leave behind after his termination. These items were requested, in writing, however, Defendant failed to return same, to the exclusion of the owner's rights. VCC kept one of Plaintiff's computers and personal property including check books and family photos which were ultimately destroyed.

88. Defendant is liable to Plaintiff for conversion and statutory theft of his personal property by intentionally deleting the hard drive of his computer which he was forced to leave behind after he was terminated.

## COUNT NINE: BREACH OF FIDUCIARY DUTY V. FARRAR

89. Plaintiff realleges and incorporates by reference paragraphs 1-88.

90. Defendant owed Plaintiff and his employees a fiduciary duty and has breached that duty.

91. Defendant, Chris Farrar is liable to Plaintiff for Farrar's gross mismanagement of the company. As President, Mr. Farrar had



THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

21

the general charge of management of the business and affairs of VCC pursuant to VCC's Operating Agreement (See Operating Agreement, page 18). His actions; therefore, directly affected Plaintiff, who was one of the Executive Vice Presidents.

92. Defendant's mismanagement included, but was not limited, to the following activities: deleting files, mishandling sensitive customer information, illegal pass through points, reporting false returns to investors, forging other employee's names on documents, failing to keep board members informed as required by the operating agreement (Exhibit 9), keeping customer deposits and deceiving investor.

93. Pursuant to the Operating Agreement, Article V, Sec. 5.5, no manager shall be liable to the Company or any Member for losses or damages suffered to them, except as the result of fraud, deceit, gross negligence, reckless or intentional misconduct or a knowing violation of the law...as a result of acts from which such Manager or officer derives an improper personal benefit." All actions alleged in Paragraph 92 above, are all clear violations under the Operating Agreement in that they are fraudulent, deceitful, grossly negligent, involve reckless and intentional misconduct and involve known violations of the law and because of the damage to Plaintiff, result in a clear breach of fiduciary duty to him.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

22

94. Plaintiff put his trust in Mr. Farrar, the President of VCC and thus it was Mr. Farrar's duty and the duty of VCC to represent Plaintiff's interests specifically as a senior management member of the company. Defendant as indicated violated that trust.

95. As a result, Plaintiff has and will suffer economic damages.

## COUNT TEN: BREACH OF FIDUCIARY DUTY V. VCC

96. Plaintiff realleges and incorporates by reference paragraphs 1-95.

97. Defendant owed Plaintiff and its employees a fiduciary duty. Defendant has breached that duty.

98. Defendant is liable to Plaintiff as one of its Executive Vice-President for gross mismanagement within the company. This mismanagement includes, but is not limited, to the following activities: deleting files, mishandling sensitive customer information, illegal pass through points, reporting false returns to investors, forging other employee's names on documents, failing to keep board members informed as required by the partnership documents (**Exhibit 9**), keeping customer deposits and deceiving investors.

99. As a result, Plaintiff has and will suffer economic damages.

## COUNT ELEVEN:
## INVASION OF PLAINTIFF'S RIGHT TO PRIVACY (INTRUSION UPON SECLUSION) V. FARRAR

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

23

100. Plaintiff realleges and incorporates by reference paragraphs 1-99.

101. Defendant intentionally intruded upon Plaintiff's solitude and private matters when they rummaged through and destroyed Plaintiff's personal documents and personal items. Despite numerous written requests for the return of personal items, Defendant failed to do so and in addition actually rummaged through Plaintiff's office and belongings following his termination, destroying some of it in the process.

102. According to Restatement (Second) [Restatement], Torts §652D, Defendant is subject to liability to Plaintiff for invasion of his privacy; as such an intrusion would be highly offensive to a reasonable person.

## COUNT TWELVE:
## INVASION OF PLAINTIFF'S RIGHT TO PRIVACY (INTRUSION UPON SECLUSION) V. VCC

103. Plaintiff realleges and incorporates by reference paragraphs 1-102.

104. Defendant, through its agents, intentionally intruded upon the solitude and private matters of Plaintiff when they rummaged and destroyed personal documents and personal items that belonged to the Plaintiff. Despite numerous written requests for the return of personal items, Defendant failed to do so and in addition

THE MARCUS LAW FIRM
275- BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

24

actually rummaged through Plaintiff's office and belongings following his termination, destroying some of it in the process.

105.  According to Restatement (Second) [Restatement], Torts §652D, Defendants are subject to liability to Plaintiff for invasion of his privacy; as such an intrusion would be highly offensive to a reasonable person.

## COUNT THIRTEEN: UNJUST ENRICHMENT V. FARRAR

106.  Plaintiff realleges and incorporates by reference paragraphs 1-105.

107.  The Defendant was benefited by the time and resources expended by the Plaintiff during the time he was employed by VCC as well as before he was employed by VCC and raising money for Chris Farrar. Specifically, Plaintiff was almost single handedly responsible for the start up of the Connecticut VCC office which ultimately accounted for 40% of VCC revenue and profits. It was Plaintiff who raised the required capital and found the necessary investors Farrar could not in order to fund VCC, without which the company would not have existed after October 31, 2004.

108.   Farrar and Plaintiff had worked together in the past, Plaintiff having managed funds for Farrar prior to their VCC dealings and had established a trusting relationship. Based upon that, Plaintiff agreed to work for much less than the position should have paid. He

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

25

did so based upon the understanding that his salary would be raised by more than $40,000.00 upon the Connecticut office being fully operational and cash flow positive, as well as receive the 15% equity position in VCC.

109.   Having raised the capital required to start up the Connecticut VCC office, Plaintiff should have been given the 15% equity he was promised. Defendant unjustly failed to pay Plaintiff for the work that he performed on behalf of the company. This was all to Farrar's benefit and Plaintiff's detriment.

110.   Failure to raise Plaintiff's salary as agreed upon and understood and failure to give Plaintiff the 15% equity position agreed upon and understood was to Plaintiff's sole detriment and therefore, Defendant was unjustly enriched.

## COUNT FOURTEEN: UNJUST ENRICHMENT V. VCC

111.   Plaintiff realleges and incorporates by reference paragraphs 1-110.

112.   The Defendant was benefited by the time and resources exhausted by the Plaintiff during the time he was employed by VCC. Specifically, Plaintiff was almost single handedly responsible for the start up of the Connecticut VCC office. It was Plaintiff who was able to raise the required capital and found the necessary investors Farrar could not in order to fund VCC.

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

26

113.    At the beginning of his employment at VCC, Plaintiff agreed to work for only $60,000.00 which is a salary much lower than what the position should have paid.  He did so based upon the understanding that his salary would be raised by more than $40,000.00 upon the Connecticut office being fully operational and cash flow positive, as well as receive the 15% equity position in VCC.

114.    Having raised the capital required to start up the Connecticut VCC office, Plaintiff should have been given the 15% equity position he was promised. Defendant unjustly failed to pay Plaintiff for the work that he performed on behalf of the company. This was all to Farrar's benefit and Plaintiff's detriment. Plaintiff was responsible for finding CBASS as an investor but never received a fee for doing so either.

115.    Failure to raise Plaintiff's salary as agreed upon and understood and failure to give Plaintiff the 15% equity agreed upon and understood was to Plaintiff's sole detriment and therefore, Defendant was unjustly enriched.

## COUNT FIFTEEN: FRAUDULENT MISREPRESENTATION V. FARRAR

116.    Plaintiff realleges and incorporates by reference paragraphs 1-115.

117.    Defendant made numerous fraudulent misrepresentations to Plaintiff prior to the start up of the Connecticut VCC office which

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

27

Defendant made as statements of fact. Defendant made these statements knowing he had no intention of following through with his promises to Plaintiff.

118. As Plaintiff was working full time on VCC business he requested that he be put on the VCC payroll. Plaintiff agreed to work for $5000.00/month or $60,000.00 a year to cover his bills but only up until the Connecticut office became profitable, at which time he was to receive $100,000.00 per year, the same amount the other executive vice president received. Defendant also promised Plaintiff he would receive 15% equity in the company to compensate Plaintiff for obtaining monies for VCC and to further compensate Plaintiff for his time and efforts in building VCC.

119. It appears that at no time during the agreement between Plaintiff and Defendant, Defendant had any intention of following through with his promises to Plaintiff, and in fact intentionally misrepresented to Plaintiff the terms of their agreement. These statements were only made to induce the Plaintiff to raise the capital that Defendant could not; based upon promises that Defendant had no intention of keeping.

120. In reliance on the misrepresentations made by Defendant, Plaintiff terminated all other employment, including his work for a billion dollar client and closed his own investment company, which he

'HE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

28

had operated for almost three years and had earned significant income from.

121. As a result of Defendant's fraudulent misrepresentations, Plaintiff has suffered economic and emotional harm.

## COUNT SIXTEEN: VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT v. FARRAR

122. Plaintiff realleges and incorporates by reference paragraphs 1-121.

123. At all relevant times herein, VCC was engaged in trade or business as those terms are defined in the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110a, et seq. ["CUTPA"];

124. The unlawful and improper actions of VCC, as described herein, constitute unfair and deceptive acts or practices in the conduct of a trade or business in violation of CUTPA including but not limited to one or more of the following reasons:

- a) promising Plaintiff, an employee, an equity ownership in the company and failing to do so;
- b) promising Plaintiff an increased salary and failing to do so;
- c) removing personal property from Plaintiff's office without his permission;
- d) defaming Plaintiff;
- e) Employees were accepting loans that were outside of industry and VCC's guidelines;



THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

29

f) Employees of VCC failed to make proper disclosures to its investors;

g) Employees were receiving improper percentages of the profit on loans (**Exhibit 10**); and

h) Loans were being closed that were incomplete or were questionably fraudulent.

125. VCC's acts and practices are immoral, unethical, and unscrupulous.

126. VCC's and its employees' acts and practices were in violation of the requirements and/or spirit of C.G.S.A. § 42-110b(a).

127. As a result of the foregoing, Plaintiff has suffered an ascertainable loss of money, specifically loss of income. Plaintiff also suffered damage to his professional and personal reputation based upon the allegations made by Defendants following Plaintiff's termination.

128. Plaintiff is entitled to claim, and does hereby claim his reasonable attorney's fees and costs from Farrar, under the authority of C.G.S.A. Section 42-110g(d).

## COUNT SEVENTEEN: VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT v. VCC

129. Plaintiff realleges and incorporates by reference paragraphs 1-128.



THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

30

130. At all relevant times herein, VCC was engaged in trade or business as those terms are defined in the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110a, et seq. ["CUTPA"].

131. The unlawful and improper actions of VCC, as described herein, constitute unfair and deceptive acts or practices in the conduct of a trade or business in violation of CUTPA including but not limited to one or more of the following reasons:

> a) promising Plaintiff, an employee, an equity ownership in the company and failing to do so;
>
> b) promising Plaintiff an increased salary and failing to do so;
>
> c) removing personal property from Plaintiff's office without his permission;
>
> d) defaming Plaintiff;
>
> e) Employees were accepting loans that were outside of industry and VCC's guidelines;
>
> f) Employees of VCC failed to make proper disclosures to its investors;
>
> g) Employees were receiving improper percentages of the profit on loans (**Exhibit 10**); and
>
> h) Loans were being closed that were incomplete or were questionably fraudulent.

132. VCC's acts and practices are immoral, unethical, and unscrupulous.

133. VCC's and its employees' acts and practices were in violation of the requirements and/or spirit of C.G.S.A. § 42-110b(a).

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

31

134. As a result of the foregoing, Plaintiff has suffered an ascertainable loss of money, specifically loss of income. Plaintiff also suffered damage to his professional and personal reputation based upon the allegations made by Defendants following Plaintiff's termination.

135. Plaintiff is entitled to claim, and does hereby claim his reasonable attorney's fees and costs from VCC, under the authority of C.G.S.A. Section 42-110g(d).

**Wherefore, Plaintiff claims:**

1) Monetary Damages;

2) Reasonable Attorneys Fees pursuant to Connecticut General Statute §42-110g(d);

3) Damages in excess of FIFTEEN THOUSAND DOLLARS ($15,000.00), exclusive of interest and costs;

4) Jury trial; and

5) Such relief in law or equity as the court may appertain.

The Plaintiff,

Shelley A. Marcus (ct 20905)
smarcus@marcuslawfirm.com
The Marcus Law Firm
275 Branford Road
North Branford, CT 06471
Tel. 203-481-3330
His Attorneys

THE MARCUS LAW FIRM
275 BRANFORD ROAD
NORTH BRANFORD, CT
06471
(203) 481-3330
FAX (203) 488-4070
JURIS NO. #35870

32

# EXHIBIT 1

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## VELOCITY COMMERCIAL CAPITAL, LLC
## A CALIFORNIA LIMITED LIABILITY COMPANY

This Amended and Restated Operating Agreement is made as of May 2, 2005, by and among the respective Members identified on the signature pages hereof with reference to the following facts:

### RECITALS

The parties hereto now desire to execute this Agreement to amend and restate the Operating Agreement dated as of July 12, 2004 to provide, among other things, for the admission of C-BASS as a Member pursuant to the terms set forth herein and to set forth certain rights, obligations and agreements relating to the management of the Company and ownership of equity in the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the parties agree that the following shall be the Operating Agreement of the Company.

### ARTICLE I
### DEFINITIONS

When used in this Agreement, the following terms have the following meanings:

1.1 "Act" shall mean the Beverly-Killea Limited Liability Company Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time..

1.2 "Adjusted Capital Account" of a Member means the Capital Account of that Member increased by the Member's share of Company Minimum Gain and Member Minimum Gain.

1.3       "Adjusted Capital Contribution" of a Member means the excess of (a) that Member's Capital Contribution to the Company, over (b) Distributions to that Member under Section 6.8(a).

1.4       "Affiliate" of a Member or Manager means (a) a Person directly or indirectly (through one or more intermediaries) controlling, controlled by or under common control with that Member or Manager; (b) an officer, director, partner, member or immediate family member of that Member or Manager; or (c) a member of the immediate family of an officer, director, partner or member of that Member or Manager. For these purposes "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.5       "Agreement" means this Operating Agreement of Velocity Commercial Capital, LLC, as originally executed and as amended from time to time.

1.6       "Bankruptcy" of a Member means the institution of any proceedings under any federal or state law for the relief of debtors, including the filing by or against that Member of a voluntary or involuntary case under the federal bankruptcy law, which proceedings, if involuntary, are not dismissed within sixty (60) days after their filing; an assignment of the property of that Member for the benefit of creditors; the appointment of a receiver, trustee or conservator of any substantial portion of the assets of that Member, which appointment, if obtained ex parte, is not dismissed within sixty (60) days thereafter; the seizure by a sheriff, receiver, trustee or conservator of any substantial portion of the assets of that Member; the failure by that Member generally to pay its debts as they become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court; or that Member's admission in writing of its inability to pay its debts as they become due.

1.7       "Board Members" shall have the meaning set forth in Section 5.1(b).

1.8       "Board Member Proxy" shall have the meaning specified in Section 5.1(e).

1.9       "Board Member Proxy List" shall mean, the list of names prepared and signed by each Manager and delivered to the Secretary of the Company setting forth the order in which such persons listed may become such appointing person's Board Member Proxy for any meeting. Such Board Member Proxy List shall be a complete list of all persons eligible to act as a Board Member Proxy for the appointing member of the Board of Managers. Each member of the Board of Managers may amend, supplement or revise his Board Member Proxy List from time to time by sending a revised, signed Board Member Proxy List to the Secretary of the Company, which shall become effective when received by the Secretary of the Company.

1.10      "C-BASS" shall mean Credit-Based Asset Servicing and Securitization LLC, a Delaware limited liability company and a Member.

1.11      "Capital Account" Capital Account means the Capital Account maintained for each Member in accordance with the following provisions:

(a)      Each Member's Capital Account shall be credited by the Member's Capital Contribution, the Member's distributive share of Net Income and any item in the nature of income or gain which are specially allocated pursuant to Section 6.2(b) hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

2

(b)    From each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Net Loss and any item in the nature of expenses or losses which are specially allocated pursuant to Section 6.2(b) hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)    In the event all or a portion of a Membership Interest is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the Transferred Membership Interest.

(d)    In determining the amount of any liability for purposes of subparagraphs (a) and (b) hereof there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provision and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article IX hereof upon the dissolution of the Company.

1.12    "Capital Contribution" of a Member, at any particular time, means the amount of money or property which that Member has theretofore contributed to the capital of the Company, which as of the date of this Agreement shall be the amount set forth opposite such Member's name on Exhibit A.

1.13    "C-BASS Manager" C-BASS Manager shall have the meaning set forth in Section 5.1(c).

1.14    "Certificate of Formation" or "Articles of Organization" means the Articles of Organization of the Company as filed under the Act with the California Secretary of State, as the same may be amended from time to time.

1.15    "Class A Interest" means a Members Interest that is held by a Class A Member, and is identified as such in Exhibit A.

1.16    "Class B Interest" means a Membership Interest that is held by a Class B Member, and is identified as such in Exhibit A.

1.17    "Code" means the Internal Revenue Code of 1986, as amended.

1.18    "Company" means Velocity Commercial Capital, LLC, a California limited liability company.

1.19    "Company Minimum Gain" with respect to any taxable year of the Company means the "partnership minimum gain" of the Company computed strictly in accordance with the principles of Section 1.704-2(d) of the Treasury Regulations.

3

1.20    "Conversion" shall mean the conversion of the Company from the form of a limited liability company to the form of a corporation.

1.21    "Depreciation" depreciation means, for each fiscal year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such fiscal year, except that if the Gross Asset Value of an asset differs from its adjusted tax basis for federal income tax purposes at the beginning of such fiscal year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Company Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

1.22    "Distributable Cash" at any time means that portion of the cash then on hand or in bank accounts of the Company which the Boards of Managers, in its sole discretion, deems available for distribution to the Members, taking into account (a) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise) and (b) the amount of cash necessary to establish prudent reserves for the payment of future capital expenditures, improvements, retirements of indebtedness, operations and contingencies, known or unknown, liquidated or unliquidated, including, but not limited to, liabilities which may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement as determined by the Board of Managers in its sole discretion.

1.23    "Distribution" means the transfer of money or property by the Company to one or more Members without separate consideration.

1.24    "Economic Interest" means the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit or similar items, but does not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company or the right to information concerning the business and affairs of the Company.

1.25    "Economic Risk of Loss" means the economic risk of loss within the meaning of Section 1.752-2 of the Treasury Regulations.

1.26    "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

1.27    "Former Member" has the meaning specified in Section 8.2.

1.28    "Former Member's Interest" has the meaning specified in Section 8.2.

1.29    "Gross Asset Value" Gross Asset Value means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The Gross Asset Value of any asset contributed by a Member to the Company is the gross fair market value of such asset as determined by the Board of Managers at the time of contribution;

(b)    The Gross Asset Value of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Board of Manager, as of the following times:

4

(i) the acquisition of any additional Membership Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for a Membership Interest; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(c)     The Gross Asset Value of any Company asset distributed to a Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Board of Managers.

If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to clause (a) or (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income or Net Loss.

1.30    "Majority in Interest" means Membership Interests which, taken together, exceed fifty percent (50%) of the aggregate of all Membership Interests held by all Members of the Company (unless a particular provision calls for approval by the Majority in Interest of (a) the holders of Class A Interests, which means the Class A Interests which, taken together, exceed fifty percent (50%) of the aggregate of all Class A Interests held by all holders of Class A Interests of the Company, or (b) of some other specified group of equity holders, which means the Interests which, taken together, exceed fifty percent (50%) of the aggregate of all Interests held by all holders of such specified group).

1.31    "Manager" or "Managers" means all of the then Managers of the Company appointed pursuant to Section 5.1.

1.32    "Master Mortgage Loan Purchase Agreement" means that certain Master Mortgage Loan Purchase Agreement dated as of April 1, 2005 entered into by and between the Company and Credit-Based Asset Servicing and Securitization LLC.

1.33    "Member" means each Person who (a) is a signatory to this Agreement, has been admitted to the Company as a Member in accordance with this Agreement or is a transferee of a Member who has become a Member in accordance with Article VII, and (b) has not suffered a Membership Termination Event.

1.34    "Member Minimum Gain" has the meaning given to the term "partner nonrecourse debt minimum gain" in Section 1.704-2(d) of the Treasury Regulations.

1.35    "Member Nonrecourse Debt" means any "partner nonrecourse liability" or "partner nonrecourse debt" under Section 1.704-2(b)(4) of the Treasury Regulations. Subject to the foregoing, it means any Company liability to the extent the liability is nonrecourse for purposes of Section 1.1001-2 of the Treasury Regulations, and a Member (or related Person within the meaning of Section 1.752-4(b) of the Treasury Regulations) bears the Economic Risk of Loss under Section 1.752-2 of the Treasury Regulations because, for example, the Member or related Person is the creditor or a guarantor.

1.36    "Member Nonrecourse Deductions" means the Company deductions, losses and Code Section 705(a)(2)(B) expenditures, as the case may be (as computed for "book" purposes), that are treated as deductions, losses and expenditures attributable to Member Nonrecourse Debt under Section 1.704-2(i)(2) of the Treasury Regulations.

1.37    "Membership Interest" means a Member's total interest as a member of the Company, including that Member's share of the Company's Net Profits, Net Losses, Distributable Cash or other Distributions, its right to inspect the books and records of the Company and its right, to the extent specifically provided in this Agreement, to participate in the business, affairs and management of the Company and to vote or grant consent with respect to matters coming before the Company.

1.38    "Membership Termination Event" with respect to any Member means one or more of the following: the death, dissolution or occurrence of any other event which terminates the existence as an entity of any Member, other than a Transfer of a Member's Membership Interest which is made in accordance with the provisions of Article VII.

1.39    "Minimum Vote" Minimum Vote shall mean with respect to action required by the Board of Managers, the affirmative vote of a majority of members of the Board of Managers (or their proxy) present (in person or by telephone) at a meeting of the Board of Managers where a Quorum (as defined in Section 5.1(e) of this Agreement) is present and, with respect to action required by the Members, shall be the affirmative vote of a Majority in Interest, present (in person or by telephone) at a meeting of the Members.

1.40    "Net Profits" and "Net Losses" Net Profit or Net Loss shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss) with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account as an item of profit or income pursuant to this definition shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account as an item of loss or expense pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subdivisions (b) or (c) of the definition of "Gross Asset Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profit or Net Loss;

(d)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)    In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Company Year, computed in accordance with the definition of "Depreciation"; and

(f)    Any items which are specially allocated pursuant to the provisions of Section 6.1, 6.2, 6.3, 6.4 and 6.5 hereof shall not be taken into account in computing Net Profit or Net Loss.

6

1.41 "Nonrecourse Deductions" in any fiscal period means the amount of Company deductions that are characterized as "nonrecourse deductions" under Section 1.704-2(b) of the Treasury Regulations.

1.42 "Nonrecourse Liability" means a liability treated as a "nonrecourse liability" under Sections 1.704-2(b)(3) and 1.752-1(a)(2) of the Treasury Regulations.

1.43 "Option Pool" has the meaning specified in Section 5.1.

1.44 "Percentage Interest" of a Member means the percentage ownership interest in the Company, entitling a Member to all rights and benefits, and subjecting a Member to all obligations, under this Agreement, including but not limited to an interest in income, losses and distributions of the Company; provided however, the Percentage Interest of a Member holding Class B Interests shall include only the vested percentage of such Member's Percentage Interest. Initially, a Member's Percentage Interest is as set forth opposite such Member's name on Exhibit A as of the date of this Agreement, or as determined by the Board of Managers upon the admission of such Member. Upon the withdrawal or addition of a Member pursuant to the terms of this Agreement or upon an additional Capital Contribution or withdrawal of capital by a Member pursuant to the terms of this Agreement, the Percentage Interest of each Member shall be adjusted proportionately based on such Member's Capital Contributions compared to the aggregate Capital Contributions of all Members, in each case as determined immediately following such withdrawal, admission, additional Capital Contribution or withdrawal of capital. The initial Percentage Interest held by a permitted Assignee shall be the Percentage Interest of the Membership Interest which was transferred to such permitted Assignee, except that if the permitted Assignee was a Member prior to the permitted Transfer, the Percentage Interest of the Membership Interest so transferred shall be added to the Percentage Interest otherwise held by that Member.

1.45 "Permitted Investments" means:

(i) cash or cash equivalents;

(ii) direct obligations of the government of the United States;

(iii) obligations fully guaranteed by the government of the United States;

(iv) certificates of deposit issued by, or bankers' acceptances of, or time deposits or a deposit account with, any bank, trust company or national banking association incorporated or doing business under the laws of the United States or one of the states thereof (excluding any branch of any such bank, trust company or national banking association located outside of the United States and the territories and possessions thereof), having a combined capital and surplus of at least $500,000,000 and having a long-term debt rating of "AA" or better from Thomsons (formerly Keefe) Bank Watch Service;

(v) commercial paper issued by companies in the United States that directly issue their own commercial paper and that are doing business under the laws of the United States or one of the states thereof and in each case having a rating assigned to such commercial paper by a nationally recognized rating organization in the United States of America equal to the highest rating assigned by such organization;

7

         (vi)     obligations of the type described in clauses (ii) and (iii) above, purchased from any bank, trust company or national banking association referred to in clause (iv) above pursuant to repurchase agreements obligating such bank, trust company or national banking association to repurchase any such obligation not later than 10 days after the purchase of any such obligation; or

         (vii)    shares of any money market fund registered under the Investment Company Act of 1940, as amended, the principal of which is invested solely in U.S. Treasury or agency obligations or in repurchase agreements secured by such obligations.

    1.46    "Person" means any entity, corporation, company, association, joint venture, joint stock company, partnership, trust, limited liability company, limited liability partnership, real estate investment trust, organization, individual (including personal representatives, executors and heirs of a deceased individual), nation, state, government (including agencies, departments, bureaus, boards, divisions and instrumentalities thereof), trustee, receiver or liquidator.

    1.47    "Qualifying Mortgage Loan" has the meaning set forth in the Master Mortgage Loan Purchase Agreement.

    1.48    "Senior Executive Officers" means the President, the Chief Operating Officer, the Chief Financial Officer, any Executive Vice President and any Senior Vice President of the Company.

    1.49    "Tax Credits" means all credits against income or franchise taxes and credits allowable to Members under state, federal or other tax statutes.

    1.50    "Tax Distribution" means, for each Member, the amount which reflects the Net Profits allocable to such Member pursuant to Article VI, which amount shall be multiplied by (A) the Tax Rate and (B) the weighted average Percentage Interest of such Member during the related calendar year to which such tax obligation relates.

    1.51    "Tax Rate" means the then combined highest federal and California state marginal personal income tax rate, as in effect from time to time.

    1.52    "Transfer" means, with respect to a Membership Interest or any interest therein, the sale, assignment, transfer, disposition, pledge, hypothecation or encumbrance thereof, whether direct or indirect, voluntary, involuntary or by operation of law, and whether or not for value, of (a) all or any part of that Membership Interest or interest therein or (b) a controlling interest in any Person which directly or indirectly through one or more intermediaries holds that Membership Interest or interest therein.

    1.53    "Treasury Regulations" means the regulations of the United States Treasury Department pertaining to the income tax.

    1.54    "Units" means units of Membership Interest, which represent a Member's ownership interest in the Company. A Member's Percentage Interest is equal to the Units owned by a Member divided by the total number of Class A and Class B Interest Units issued by the Company and outstanding on such date (Units issuable pursuant to any outstanding rights to purchase or acquire Units shall not be deemed outstanding for any purpose hereunder, until such Units are issued by the Company). Units may but are not required to be issued in certificate form.

References in this Agreement to "Articles," "Sections," "Exhibits" and "Schedules," shall be to the Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specifically provided; all Exhibits and Schedules to this Agreement are incorporated herein by reference; any of the terms defined in this Agreement may, unless the context otherwise requires, be used in the singular or the plural and in any gender depending on the reference; the words "herein", "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and except as otherwise specified in this Agreement, all references in this Agreement (a) to any Person shall be deemed to include such Person's permitted heirs, personal representatives, successors and assigns; and (b) to any agreement, any document or any other written instrument shall be a reference to such agreement, document or instrument together with all exhibits, schedules, attachments and appendices thereto, and in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; and (c) to any law, statute or regulation shall be deemed references to such law, statute or regulation as the same may be supplemented, amended, consolidated, superseded or modified from time to time.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1     Name.  The name of the Company shall be "Velocity Commercial Capital, LLC."  The business of the Company may be conducted under that name or, upon compliance with applicable law, under any other name that the Board of Managers deems appropriate or advisable.

2.2     Term.     The term of the Company's existence commenced upon the filing of its Certificate of Formation with the California Secretary of State on June 2, 2004 and shall continue until such time as it is terminated pursuant to Article X.

2.3     Office and Agent.  The principal office of the Company shall be located at 5716 Corsa Avenue, Suite 202, Westlake Village, CA 91362 or at such other place as the Board of Managers may determine from time to time.  The Company may also have such offices within and without the State of California as the Board of Managers may from time to time determine.  The name and business address of the Company's agent for service of process in the State of California is Michael Mesnick, located at 11300 W. Olympic Blvd. Suite 610, Los Angeles, CA 90064, or such other Person as may be determined by the Board of Managers from time to time.

2.4     Purpose of Company.  The Company may engage in any lawful activity for which a limited liability company may be organized under the Act; however, its primary purpose shall be to pursue business opportunities relating to mortgage banking.

2.5     Intent.  It is the intent of the Members that the Company shall initially be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes.  It also is the intent of the Members that initially the Company not be operated or treated as a "partnership" for purposes of Section 303(b)(3) of the United States Bankruptcy Code.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1     Initial Capital Contributions.  Each Member shall contribute to the Company the money and/or other property or consideration which is agreed to by such Member and the Company, which shall be that Member's Initial Capital Contribution.

9

3.2     No Required Additional Capital Contributions. No Member shall be required to make any additional Capital Contributions. If and to the extent approved from time to time by the Board of Managers in its sole discretion, the Members may be permitted to make additional Capital Contributions. Each Member so participating shall receive a credit to its Capital Account in the amount of any additional capital which it contributes to the Company. Immediately following any additional Capital Contribution, the Percentage Interests of the Members shall be adjusted to reflect the new relative proportions thereof, if the Board of Managers agrees that the relative proportions thereof are to be altered as a result of the additional Capital Contribution, and Exhibit A shall be revised to reflect any such additional Membership Interest.

3.3     Capital Accounts. The Company shall establish and maintain an individual Capital Account for each Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

3.4     No Priorities of Members; No Withdrawals of Capital. Except as otherwise specified in Article IV, Article VI, Article X and in the Act, no Member shall have a priority over any other Member as to any Distribution, whether by way of return of capital or by way of profits, or as to any allocation of Net Profits or Net Losses. No Member shall have the right to resign or withdraw as a Member from the Company or withdraw or reduce its Capital Contributions in the Company except as a result of the dissolution of the Company, and no Member shall have the right to demand or receive property other than cash in return for its Capital Contributions. Except upon dissolution and liquidation of the Company as set forth in this Agreement, there is no agreement for, nor time set for, the return of any Capital Contribution of any Member.

3.5     No Interest. No Member shall be entitled to receive any interest on its Capital Contributions.

3.6     No Personal Obligations. No Member shall be required to lend any funds to the Company, and no Member shall have any personal liability for the repayment of any loans from or Capital Contribution of any other Member. No Member shall receive any interest on or drawing with respect to its Capital Contributions or its Capital Account.

## ARTICLE IV
## MEMBERS

4.1     Classes of Members: Class A and Class B.

(a) The Company shall have two classes of Members: Class A Members and Class B Members.

(b) Class A Members shall be the Members whose Capital Contribution was in the form of cash paid to the Company.

(c) Class B Members shall be the Members who are subordinated for the purposes of a distribution preference (described in Section 4.1(d) and 6.8(a) below) and liquidation preference (described in Section 4.1(e) below) until the Company effectuates a Conversion to a corporation.

(d) Until such time as Class A Members have received aggregate Distributions (not including Tax Distributions) equal to 100% of the amount of their Capital Contributions to the Company for their Class A Membership Interest, such Class A Members shall receive 100% of all of

10

the Distributions pursuant to Section 6.8(a) below in proportion to their Class A Percentage Interests (provided, however, that the foregoing preference shall not apply to Tax Distributions approved by the Board of Managers in accordance with to Section 6.8(a)).

(e) Upon any liquidation of the Company prior to the time the Class A Members have received aggregate Distributions (not including Tax Distributions) equal to 100% of the amount of their Capital Contributions to the Company for their Class A Interests, each Class A Members shall receive as a preferred Distribution the amount of such Member's Capital Contribution less all Distributions (not including Tax Distributions) to date; and, thereafter, such members and the Class B Members shall share pro rata in all future distributions.

(f) Upon a sale of the Company or a Conversion of the Company to a corporation, the Class B Members shall lose their subordinated position and thereafter be equal in all respects to the Class A Members.

4.2     Limited Liability. Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise; otherwise ; provided, however, that each Member shall be required to return to the Company any distribution made to it in clear and manifest accounting or similar error; provided further, however, that the foregoing shall not affect the liability of any Member for any debt, obligation or liability assumed or undertaken pursuant to any other agreement.

4.3     Admission of Additional Members; Limitations Based Upon Dilution. Subject to compliance with applicable law and the approval of the Board of Managers, additional Members may be admitted to the Company from time to time upon such terms and conditions as the Board of Managers may determine, and any such additional Members shall be granted Membership Interests (and may participate in the Distributable Cash, Net Profits, Net Losses, Tax Credits and other Distributions of the Company) on such terms as the Board of Managers may determine.

4.4     Members Have No Managerial Authority. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement and except as expressly required by any non-waivable provision of the Act. Without the written authorization of the Board of Managers to do so, no Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its assets or to render it liable for any purpose.

4.5     Members Are Not Agents. The management of the Company is vested exclusively in the Board of Managers. No Member, acting solely in its capacity as a Member, may be an agent of the Company, nor may any Member, in that capacity, bind or execute any instrument on behalf of the Company without the prior written consent of the Members.

4.6     Meetings of Members; Written Consent. Meetings of the Members shall be held at such times and places within or without the State of California as the Board of Managers may determine from time to time, but, in any event, any Member may call a special meeting of the Members upon not less than twenty (20) days prior written notice to the other Members. No annual, regular or special meetings of Members are required, but if such meetings are held, they shall be conducted pursuant to the Act. Members may participate in any meeting through the use of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting. Action taken at a meeting of the Members is effective provided such meeting is duly called and noticed. Any

11

action which may be taken by the Members at a meeting may also be taken without a meeting, if a consent in writing setting forth the action so taken is signed by Members having not less than the Minimum Votes that would be necessary to authorize that action at a meeting of the Members duly called and noticed, provided that notice of such action and form of consent sought is provided to all Members not less than two business days prior to the effective day of such consent.

4.7     Securities Laws.  To accomplish the purposes of this Article, the Board of Managers is hereby authorized to do all things necessary to admit Members, including, but not limited to, qualifying the Units for sale with federal and state securities regulatory authorities or perfecting exemptions from qualification, and entering into such contracts or arrangements for the offering and sale of Units upon such terms and conditions as the Board of Managers may deem advisable.

4.8     Member and Percentage Interests; No Certificates for Units.  The Board of Managers shall without further action by the Members amend Exhibit A hereto from time to time as necessary to reflect the Transfers of Units, additional Capital Contributions, the admission of additional or substituted Members, and the withdrawal of Members or capital, in each case as provided elsewhere in this Agreement. Units are not required to be issued in certificate form.

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Board of Managers; Appointment of Managers.

(a)     The Board of Managers; Appointment of Board of Managers.  The business and affairs of the Company shall be managed and controlled by a Board of Managers consisting of three Managers (the "Board of Managers").

(b)     Management by the Board of Managers.  Except for situations in which the approval of the Members is specifically required by the Act, the Articles of Organization or this Agreement, and subject to the requirements specified in paragraph (d) and (g) below, the Board of Managers shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters, to supervise, direct and control the actions of the officers, if any, of the Company and to perform any and all other actions customary or incident to the management of the Company's business, property and affairs. Within the resources available to the Company, the President, as directed by and consistent with the decisions of the Board of Managers shall control and direct the administration of the business and affairs of the Company in accordance with sound business practice, taking such steps as are necessary or appropriate in its reasonable judgment to conserve and enhance the value and profitability of the Company's business, property and affairs.

(c)     Composition of the Board of Managers.  The Board of Managers shall consist of three (3) members.  For so long as it is a Member, C-BASS shall be entitled to appoint one of the (1) members of the Board of Managers and such Manager's successor as described under clause (f) below (the "C-BASS Manager"). The Members other than C-BASS shall be entitled to appoint (by the affirmative vote of a Majority In Interest of all such Members other than C-BASS) two (2) members of the Board of Managers and each such Manager's successor as described below. The Managers of the Board of Managers of the Company as of the date hereof and the Member appointing each of them are shown on Exhibit B hereto.

12

(d)     Powers of the Board of Managers.  Without limiting the generality of the foregoing and without obtaining any approval from the Members except only as otherwise required in this Agreement, and subject to paragraph (g) below, the Managers shall have the exclusive power and authority to cause the Company:

(i)     to do any act in the conduct of its business and to exercise all powers granted to a limited liability company under the Act, whether in the state of California or in any other state, territory, district or possession of the United States or any foreign country, that may be necessary, convenient, desirable or incidental to the accomplishment of the business purposes of the Company;

(ii)    to own, hold, operate, maintain, finance, refinance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any asset as may be necessary, convenient, desirable or incidental to the accomplishment of the business purposes of the Company;

(iii)   to enter into, perform and carry out any contracts, leases, instruments, commitments, agreements or other documents of any kind, including, without limitation, contracts with any Member or Manager, any Affiliate thereof or any agent of the Company, necessary, convenient, desirable or incidental to the accomplishment of the business purposes of the Company;

(iv)    to sue and be sued, complain and defend and participate in administrative or other proceedings, in its own name;

(v)     to appoint officers, employees and agents of the Company, define their duties and fix their compensation, if any, and to select attorneys, accountants, consultants and other advisors of the Company;

(vi)    to indemnify any Person in accordance with the Act and to obtain any and all types of insurance;

(vii)   to borrow money from any Person, including a Member or any Affiliate of a Member, and issue evidences of indebtedness and to secure the same by mortgages, deeds of trust, security agreements, pledges, collateral assignments or other liens on the assets of the Company;

(viii)  to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any loan agreement, commitment, deed of trust, mortgage, security agreement or other loan document in respect of any assets of the Company;

(ix)    to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

(x)     to make, execute, acknowledge, endorse and file any and all agreements, documents, instruments, checks, drafts or other evidences of indebtedness necessary, convenient, desirable or incidental to the accomplishment of the business purposes of the Company;

(xi)    to cease the Company's activities and dissolve and wind up its affairs upon its duly authorized dissolution;

13

(xii)     to cause any special purpose subsidiary limited liability company wholly owned by the Company to do any of the foregoing;

(xiii)    to cause a Conversion;

(xiv)    to create an option pool ("Option Pool") under such terms as the Board of Managers will determine and approve consisting of options ("Options") to purchase Units representing up to an additional 5% of the Membership Interests set forth in Exhibit A hereto. All Options to be granted under the Option Pool will be granted to employees of the Company; and

(xv)     to issue additional Membership Interests and to create one or more classes of Membership Interests in addition to the Class A and Class B Interests in existence as of the date hereof, with such rights, preferences and privileges as determined by the Board of Managers.

(e)     Meetings of the Board of Managers.

(i)     At any meeting of the Board of Managers, the presence (in person or by telephone) of at least two Managers, shall constitute a quorum (a "Quorum") for the transaction of business and taking of any actions by or on behalf of the Board of Managers. If any Manager shall be or expects that he will be unable to attend a meeting of the Board of Managers, he shall have the right to appoint one (1) person from such Board Member's Board Member Proxy List to attend such meeting of the Board of Managers and/or any meeting of the Board of Managers occurring during the period which is specified in writing (the "Board Member Proxy"), which Board Member Proxy shall be the person in attendance at any such meeting of the Board of Managers whose name appears with the highest priority among the persons whose names appear on the Board Member Proxy List as persons who may act as such member's Board Member Proxy. Such Board Member Proxy shall be entitled and empowered to attend and to vote at such meeting in lieu of the appointing member of the Board of Managers. The Board Member Proxy may be another member of the Board of Managers appointed by the same Member. Decisions of the Board of Managers shall be reflected in writing in the form acceptable to the Board of Managers.

(ii)     Meetings of the Board of Managers shall be held at such times and locations as may be determined by the Board to discuss general business matters of the Company and those matters which are required to be submitted to the Board of Managers. To the extent permitted by law, a member of the Board of Managers participating in a meeting by conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other will be deemed present in person at the meeting and all acts taken by him during his participation shall be deemed taken at the meeting. Meetings of the Board of Managers may be called at any time by the President or any Member or Members holding at least twenty percent (20%) of the outstanding Percentage Interests of the Company. Notice of the time and place and purpose of any meeting shall be given to each member of the Board of Managers in writing or orally (confirmed promptly in writing) at least two (2) business days but not greater than twenty (20) days prior to the date of any meeting. The failure to give such timely notice may be waived before or after a meeting by any Board member and shall be deemed waived by participation by any Board member in a meeting. In order to be voted upon, any matter requiring the vote of the Board of Managers must appear on an agenda of any meeting which agenda shall have been submitted to each Manager in writing or by telecopier, telefax or e-mail at least two (2) days prior to the date of any such meeting unless waived by any Manager not receiving an agenda identifying such matter.

14

(f)     Written Consent of the Board of Managers. Any action of the Board of Managers may be taken without a meeting if a written consent to the action is signed by all the members of the Board of Managers and such written consent is filed with the minutes of proceedings of the Board of Managers.

Each Board Member Proxy, with respect to all meetings of the Board of Managers for which such Board Member Proxy was appointed pursuant to Section 5.1(e) and/or any meeting occurring during a specified period, and with respect to any action taken by written consent during such period, shall be a voting Member for all purposes hereof; provided, however, that no notice of any meeting need be given to any Board Member Proxy prior to the time such Board Member Proxy is appointed as provided herein.

(g)     Approval of the Board of Managers. Without limiting the generality of the foregoing, and without obtaining any approval from the Members as required in this Agreement, approval of actions of the Company by the Board of Managers requires the affirmative vote of two of the three Managers, provided a Quorum of Managers is present. However, unanimous approval of the Board of Managers is required for the following actions of the Company so long as C-BASS (or its wholly-owned subsidiary, pursuant to a transfer to such subsidiary under Section 7.2 below) shall own any Membership Interest in the Company (provided, however, that if any action item described on the list below is included or contemplated in the Company's annual budget and approved by the Board of Managers, such action item does not require separate Board approval and shall be deemed approved by inclusion in such approved budget) (the "Unanimous Approval"):

(i)     the sale, assignment, conveyance, exchange, lease, mortgage or other transfer of all or any part of the assets of the Company  or any of its Subsidiaries having a book value in excess of $100,000, in a transaction or in a series of related transactions, other than in the ordinary course of business

(ii)    decisions as to (A) the creation of or amendment to any credit relationship or (B) borrowing, in each case outside of the ordinary course of the Company's  or any of its Subsidiaries' Business and involving amounts which when added to all previous relationships or borrowings outside the ordinary course of business, as the case may be, which are outstanding at the time of such decision exceed $1,000,000;

(iii)   the authorization or payment of any Distributions to the Members other than Distributions: (a) pursuant to Article X hereof; and (b) Tax Distributions to Members approved by a majority of the Board of Managers;

(iv)    except for any issuance of Units upon exercise of options, provided the grant of such options was approved by the Board as required by subparagraph (x) below, any transaction which would affect the Percentage Interest of any Member as such exists immediately prior to such transaction or its rights to Distributions hereunder (provided, however, that this provision shall not apply to any proposed Transfers of any Membership Interests by Chris Farrar so long as he will own a 38% Percentage Interest, or greater, after any such Transfer);

(v)     entering into any contract with any third party service provider that provides for  actual or projected cash outflows from the Company in excess of $100,000;

15

(vi)     any merger or consolidation of or other reorganization involving the Company or the acquisition (except in the ordinary course of the Company's Business) of all or substantially all the outstanding capital stock or all or substantially all the assets of any other entity;

(vii)    the assignment of any of the property of the Company or any of its Subsidiaries in trust for the benefit of creditors, or the making or filing, or acquiescence in the making or filing by any other Person, of a petition or other action requesting the reorganization or liquidation of the Company under any Bankruptcy Law;

(viii)   any material change in the Business, the entering into any new lines of business, the suspension of the Business or the form of organization of the Company or the change of the name of the Company or the location of its principal offices;

(ix)     the acquisition of stock, partnership interests or other legal or beneficial interests in any Person, or the making of any other investment in, or, loans or advances to, any Person, other than Permitted Investments (other than (a) loans in the ordinary course of the Company's business and (b) any loans and advances to Company employees other than the President of up to $50,000 in any individual loan or advance and up to $100,000 in the aggregate);

(x)      the transfer of any Membership Interest in the Company by a Senior Executive Officer (provided, however, that this shall not apply to any proposed transfers of any Membership Interests by Chris Farrar so long as he will own a 38% Percentage Interest, or greater, after any such transfer);

(xi)     the discharge of any Senior Executive Officer or entering into any Employment Agreement that provides for any severance or termination payment or entering into any severance agreement;

(xii)    the award of any bonus or increase in the base salary or other compensation of any Senior Executive Officer and the grant of any Options to the President;

(xiii)   the commencement or settlement of any litigation involving $100,000 or more other than (a) in the ordinary course of the Company's or any of its Subsidiaries' Business or (b) other than as provided for in Section 5.4;

(xiv)    the approval of the annual budget (if any) for the Company and its Subsidiaries and the making or approval of any operating leases and/or capital expenditures, individually or in the aggregate, in excess of 10% of such budget in any one year not reflected in the annual budget approved by the Board of Managers;

(xv)     the appointment of independent auditors for the Company and its Subsidiaries;

(xvi)    the approval of all annual financial statements of the Company, and its Subsidiaries;

(xvii)   decisions with respect to the treatment of any transaction or item for income tax or financial accounting purposes in excess of $100,000, other than such decisions which are made in the ordinary course of the Company's or any of its Subsidiaries' Business;

16

(xviii)  the provision of one or more employee benefits for the Company or any of its Subsidiaries, except for benefits where the cost per employee of providing all such employee benefits does not exceed 31% of such employee's compensation;

(xix)  any amendment, modification or supplement to this Agreement or any other operating agreement of the Company, including changing size of or means of configuring the Board;

(xx)  incurrence of liens in excess of $100,000 and issuance of debt, notes or debt securities in excess of $100,000 and prepayment of same (other than pursuant to the Company's credit facility or otherwise in the Company's ordinary course of business);

(xxi)  the creation of any new class of Membership Interests after the date hereof; and

(xxii)  the formation of any subsidiary or allowing any subsidiary to do any of the matters described in the preceding items in this Section 5.1(g).

Notwithstanding anything in this Section 5.1(g) to the contrary: the action items described in paragraph (iii) above shall cease to require unanimous Board approval upon the earlier of (a) three (3) years from the date of this Agreement or (b) the date on which C-BASS has received aggregate distributions from the Company (not including Tax Distributions) equal to the amount of its capital contribution in the Company ("Repayment").

(h)  Term of Managers. Each member of the Board of Managers shall serve at the pleasure of the Member(s) that appointed him. Upon the death, resignation or removal of any Manager, the Member(s) that appointed such Manager shall promptly appoint his successor. Unless a Manager resigns, dies or is removed or is subject to a Membership Termination Event, each Manager shall hold office indefinitely. Any removal of a Manager shall be without prejudice to the rights, if any, of the Manager under any employment contract with the Company and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute its withdrawal as a Member.

(i)  Discretion of the Managers. In making any and all decisions relating to the conduct of the Company's business or otherwise delegated to them by any provision of this Agreement, the Managers shall be free to exercise their sole, absolute and unfettered discretion. The Managers shall not, in respect of any such decision, be liable to the Company, the Members or any of their respective Affiliates or constituent owners for any resulting actual or alleged losses, damages, costs or expenses suffered by them so long as such decision was made by the Managers in good faith for a purpose reasonably believed by such Managers to be in, or not opposed to, the best interests of the Company.

(j)  Devotion of Time; Salary & Limitations. The Managers shall not be obligated to devote all of their time or business efforts to the affairs of the Company; however, they shall devote such time, effort and skill as they deem appropriate for the management and operation of the Company's affairs. The members of the Board of Managers shall receive no compensation from the Company for performing their services on the Board of Managers.

5.2  Officers of the Company.

17

(a)     The Board of Managers may, at its discretion, appoint officers of the Company at any time and from time to time to conduct, or to assist the Board of Managers in the conduct of, the day-to-day business and affairs of the Company. Subject to the following, any such officers shall serve until they may resign or be terminated or replaced by the Board of Managers; provided, however, that notwithstanding anything to the contrary contained in this Agreement, so long as Chris Farrar is a Member he shall serve as the Company's President (unless he chooses to resign from such position) and receive an annual salary of not less than One Hundred Twenty Thousand Dollars ($120,000) (subject to increase from time to time pursuant to the Company's annual budget as approved by the Board of Managers). Any such officers shall have the powers customary for such positions, and shall report to the Board of Managers.

(b)     The executive officers of the Company shall be a President, a Chief Operating Officer (the "COO"), a Chief Financial Officer (the "CFO"), a Treasurer and a Secretary, each of whom shall be elected by the Board of Managers. A person may hold more than one office. In addition, the Board of Managers may also elect one or more Assistant Secretaries or one or more vice presidents, who may be designated Senior or Executive Vice President (each a "Vice President") or such additional executive or other officers as the Board of Managers may from time to time deem necessary, advisable or convenient.

(c)     To the extent any activity described in Section 5.1(d) or 5.1(g) is approved or authorized by the Board of Managers in accordance with Section 5.1(d) and 5.1(g), the President or any Vice President shall have the authority to execute all agreements or other instruments in the name of and on behalf of the Company which are necessary or desirable to effect any such approved or authorized activity. The compensation of officers shall be fixed by the Board of Managers or in such manner as it may provide (subject to Section 5.2 above). The officers of the Company on the date hereof are identified on Exhibit C hereto.

(d)     Subject to Section 5.2(a) above, any officer of the Company may be removed at any time, either with or without cause, by the Board of Managers.

(e)     Any officer may resign at any time by giving written notice to the Board of Managers or to the President. Such resignation shall take effect at the time specified in the notice, or if no time is specified, at the time of receipt of the notice, and the acceptance of such resignation shall not be necessary to make it effective.

(f)     The President shall be the chief executive officer of the Company, shall have general charge of management of the business and affairs of the Company, subject to the control of the Board of Managers, and shall insure that all orders and resolutions of the Board of Managers are carried into effect. The President shall have such other duties as from time to time may be assigned to him by the Board of Managers. The President shall be invited to attend and will preside over any meeting of the Board of Managers. Except as otherwise provided herein, the President shall run the day-to-day operations of the Company. Any actions not specifically reserved to the Members pursuant to this Agreement or otherwise specifically determined by the Members, as the case may be, to be voted upon by the Members, shall be subject to the discretion of the Board of Managers, except as provided below, or as specifically delegated by the Board of Managers to the officers or as reserved by the Members of the Company.

(g)     The CFO and President shall each have such powers and perform such duties in the management of the property and affairs of the Company, subject to the control of the Board of Managers and the President, as customarily pertain to such offices (were the Company in corporate

18

form), as well as such powers and duties as from time to time may be prescribed by the Board of Managers and the President.

(h)    Under the supervision of the Board of Managers, the Treasurer of the Company (i) shall have the care and custody of the Company's funds and the books relating thereto, including the power to open and manage accounts and execute borrowing requests on behalf of the Company; and (ii) shall perform all other duties incident to the office of Treasurer. The Treasurer shall have such additional powers and perform such additional duties in the management of the property and affairs of the Company, subject to the control of the Board of Managers, as customarily pertain to the office of Treasurer (were the Company in corporate form).

(i)    The Secretary shall be invited to attend all Board of Managers meetings and record all the proceedings of the meeting in the minute book of the Company. Under the supervision of the Board of Managers, the Secretary (i) shall give, or cause, to be given, all notices required to be given under this Agreement; (ii) shall have such powers and duties as the Board of Managers may, from time to time, prescribe; and (iii) shall have custody of the seal, if any, of the Company. The Secretary shall have such additional powers and perform such additional duties in the management of the property and affairs of the Company, subject to the control of the Board of Managers, as customarily pertain to the office of Secretary (were the Company in corporate form).

(j)    The Vice Presidents, if any, in the order determined by the Board of Managers, shall have such powers and perform such duties in the management of the property and affairs of the Company, subject to the control of the Board of Managers and the President, as customarily pertain to their respective offices (were the Company in corporate form), as well as such powers and duties as from time to time may be prescribed by the Board of Managers or the President.

(k)    The officers of the Company, other than the Chairman, the President, the CFO, the Treasurer, any Vice President and the Secretary, shall have such powers and perform such duties in the management of the property and affairs of the Company, subject to the control of the Board of Managers and the President, as customarily pertain to their respective offices (were the Company in corporate form), as well as such powers and duties as from time to time may be prescribed by the Board of Managers or the President.

(l)    The Company may secure the fidelity of any or all of its officers or agents by bond or otherwise.

5.3    Limitations on Power of Board of Managers. Notwithstanding any other provision of this Agreement, however, the Board of Managers shall have no power or authority to approve or cause the Company to engage in any action that pursuant to the Act requires the affirmative vote or written consent of the Members.

5.4    Certain Transactions. Notwithstanding that it may constitute a conflict of interest, the Members and/or Managers may, and may cause their Affiliates to, engage in any transaction with the Company so long as that transaction is approved by the Board of Managers (and in the case of a conflict of interest involving any of the Managers, so long as that transaction is approved by the two disinterested Managers on the Board). Additionally, and notwithstanding anything in this Agreement to the contrary, the decision for the Company to commence, pursue, defend and/or settle litigation against any Manager (or affiliate of any Manager) shall only require the approval of the other two Managers (and shall not require unanimous consent of all three Managers on the Board).

5.5     Performance of Duties; Liability of Managers and Officers.  No Manager or officer shall be liable to the Company or to any Member for any losses or damages suffered by them, except as the result of fraud, deceit, gross negligence, reckless or intentional misconduct or a knowing violation of law or this Agreement by such Manager or officer or as a result of acts from which such Manager or officer derives an improper personal benefit.  The Managers and officers shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and the Members.  In performing their duties, the Managers and officers shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Managers and officers act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

          (a)     one or more agents of the Company whom the Managers or officers, as the case may be, reasonably believe to be reliable and competent in the matters presented; or

          (b)     any attorney, independent accountant or other Person as to matters which the Managers or officers, as the case may be, reasonably believe to be within such Person's professional or expert competence.

5.6     Expenses.  The Company shall reimburse the Members and the Managers and their respective Affiliates for all reasonable out-of-pocket costs and expenses incurred by them in connection with the business and affairs of the Company.

5.7     Treatment of Affiliate Loans and Fees.  To the fullest extent permitted by law, all principal interest, costs and expenses owing by the Company to the Members, the Managers and/or Affiliates thereof in repayment of loans and all fees, commissions and/or reimbursable amounts payable by the Company to the Members, the Managers and/or Affiliates thereof shall be treated in the same manner as liabilities payable to unaffiliated creditors of the Company and shall be paid and taken into account, as such, before any Distributions of Distributable Cash are made to the Members.

5.8     Loans.  No Member or Manager shall be required to make any loans or otherwise lend any funds to the Company.  No Member or Manager shall be permitted to make any loans or otherwise lend any funds to the Company, except with the approval of the Board of Managers.  In the event that any Member or Manager lends funds to or advances money on behalf of the Company on an unsecured basis, such Member or Manager shall have all the rights of a general creditor, or as a secured creditor, if security is granted by the Company to such Member or Manager in respect of such loan or advance. No loan made by any Member to the Company shall increase such Member's Percentage Interest in the Company. Loans shall have such terms and conditions as may be approved by the Board of Managers.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS, NET LOSSES AND DISTRIBUTIONS

6.1     Minimum Gain Chargeback.  In the event that there is a net decrease in the Company Minimum Gain during any taxable year, the minimum gain chargeback described in Sections 1.704-2(f) and (g) of the Treasury Regulations shall apply.

6.2     Member Minimum Gain Chargeback.  If during any taxable year there is a net decrease in Member Minimum Gain, the partner minimum gain chargeback described in Section 1.704-2(i)(5) of the Treasury Regulations shall apply.

20

6.3    Qualified Income Offset. Any Member who unexpectedly receives an adjustment, allocation or Distribution described in subparagraphs (4), (5) or (6) of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, which adjustment, allocation or distribution creates or increases a deficit balance in that Member's Capital Account, shall be allocated items of "book" income and gain in accordance with the provisions of the "qualified income offset" as described in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

6.4    Nonrecourse Deductions. Nonrecourse Deductions shall be allocated to the Members in proportion to their Percentage Interests.

6.5    Member Nonrecourse Deductions. Member Nonrecourse Deductions shall be allocated to the Members as required in Section 1.704-2(i)(1) of the Treasury Regulations in accordance with the manner in which the Members bear the burden of an Economic Risk of Loss corresponding to the Member Nonrecourse Deductions.

6.6    Allocation of Net Profits. The Net Profits for each fiscal period of the Company shall be allocated to the Members in accordance with the following order of priority:

(a)    first, to the Class A Members in an amount equal to their Capital Contributions; and

(b)    then, to the Members in proportion to their Percentage Interests.

6.7    Allocation of Net Losses. Net Losses for each fiscal period of the Company shall be allocated to the Members in accordance with the allocation of Net Profits.

6.8    Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Board of Managers may, in its sole discretion, elect from time to time to cause the Company to distribute Distributable Cash to the Members, which Distributions shall be in the following order of priority:

(a)    First, until such time as Class A Member have received aggregate Distributions (not including Tax Distributions) equal to 100% of the amount of their Capital Contributions to the Company for their Class A Membership Interest, such Class A Members shall receive 100% of the Distributions in proportion to their Class A Percentage Interests; and

(b)    Then, to the Members in proportion to their Percentage Interests.

Notwithstanding anything in this Agreement to the contrary, the Board of Managers may (by a majority vote of the Board of Managers), in its sole discretion, elect from time to time to cause the Company to distribute Tax Distributions to the Members which Tax Distributions shall be made to all the Members in proportion to their Percentage Interests.

6.9    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is Transferred or is increased or decreased by reason of the admission of a new Member or otherwise during any Fiscal Year, each item of income, gain, loss, deduction or credit of the Company for that Fiscal Year shall be assigned pro rata to each day in the particular period of that Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each item so assigned to any such day shall be allocated to the Member based upon that Member's respective Membership Interest at the close of that

21

day. Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date that sale or other disposition occurs.

6.10    Tax Allocation Matters.

(a)    Contributed or Revalued Property.    Each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property where the Company's property is revalued pursuant to Paragraph (b)(2)(iv)(*f*) of Section 1.704-1 of the Treasury Regulations, shall be determined in the manner (and as to revaluations, in the same manner as provided in Section 704(c) of the Code) if deemed appropriate by the Manager. The allocation shall take into account, to the full extent required or permitted by the Code, the difference between the adjusted basis of the property to the Member contributing it and the fair market value of the property determined by the Manager at the time of its contribution or revaluation, as the case may be. The Company shall apply Section 704(c)(1)(A) by using the "traditional method" as set forth in Section 1.704-3(b) of the Treasury Regulations.

(b)    Recapture Items.    In the event that the Company has taxable income that is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain or loss from the sale of Company assets (to the difference possible) shall include a proportionate share of this recapture income equal to that Member's share of prior cumulative depreciation deductions with respect to the assets which gave rise to the recapture income.

6.11    Order of Application.    To the extent that any allocation, Distribution or adjustment specified in any of the preceding Sections of this Article VI affects the results of any other allocation, Distribution or adjustment required herein, the allocations, Distributions and adjustments specified in the following Sections shall be made in the priority listed:

(a)    Section 6.8.

(b)    Section 6.1.

(c)    Section 6.2.

(d)    Section 6.3.

(e)    Section 6.4.

(f)    Section 6.5.

(g)    Section 6.7.

(h)    Section 6.6.

(i)    Section 10.5.

These provisions shall be applied as if all Distributions and allocations were made at the end of the Company's Fiscal Year. Where any provision depends on the Capital Account of any Member,

that Capital Account shall be determined after the operation of all preceding provisions for the Fiscal Year.

6.12    Allocation of Liabilities.  Each Member's interest in "partnership" profits for purposes of determining that Member's share of "excess nonrecourse liabilities" of the Company as used in Section 1.752-3(a)(3) of the Treasury Regulations, shall be equal to that Member's Percentage Interest.

6.13    Form of Distribution.  No Member, regardless of the nature of its Capital Contribution, has the right to demand and receive any Distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate Distribution of money being made to other Members, and except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a Distribution of any asset in kind.

## ARTICLE VII
## TRANSFER OF INTERESTS

7.1    Transfer of Interests.  Except as permitted by Section 7.2 and 7.4, and subject to compliance with Sections 7.3 and 7.7, no Member shall be entitled to Transfer all or any part of its Membership Interest except with the prior written consent of the Board of Managers, which consent may be given or withheld, conditioned or delayed as the Board of Managers may determine in its sole discretion.  Any attempted Transfer without such prior written consent shall be null and void ab initio, and the transferee shall not become a Member.  After the consummation of any permitted Transfer of all or any part of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to the terms and provisions of this Agreement, and any further Transfers shall be required to comply with the terms and provisions of this Agreement.

7.2    Permitted Transfers.  Notwithstanding anything to the contrary herein, a Member may transfer, assign or alienate (an "FLP Transfer") any or all of his  Interests to any family limited partnership or trust formed for the benefit of such Member and/or his family (each, an "FLP").  Any such FLP Transfer shall require that the Member retain the right to Control (as hereinafter defined) of the FLP so long as any Interests are owned by the FLP. "Control" for this purpose shall mean the sole authority to take action with respect to the transferred Interests. A Member who elects to execute any FLP Transfer shall provide thirty days' prior written notice of his intention to effect the FLP Transfer to the other parties to this Agreement. Prior to the effectiveness of such FLP Transfer, (i) the Member shall cause the transferee FLP to become a party to the Operating Agreement and  (ii) a Majority In Interest of Members (excluding the Member desiring to effect the FLP Transfer) shall approve the terms of the agreement forming the FLP (the "FLP Agreement"), which approval shall not be unreasonably withheld or delayed and (iii) the FLP Agreement shall contain provisions, similar to those contained in the limited liability company agreement of the Company, restricting the ability to effect a direct transfer of Interests owned by the FLP or an indirect transfer of such Interests by means of transferring interests in the FLP. (The foregoing provision is subject to Chris Farrar's right to make Permitted Transfers pursuant to Section 7.4, such that if he will maintain a 38% Percentage Interest after any proposed FLP Transfer, no Member approval of the FLP Agreement shall be required).

C-BASS may transfer all (but not part) of its Member Interest to any wholly-owned subsidiary (a "Subsidiary Transfer"), subject to the following terms: (1) C-BASS shall retain the right to appoint all of the Board of Directors or Manager(s), as applicable, of the subsidiary (the "Subsidiary") so long as any Interests are owned by such Subsidiary; (2) C-BASS shall enter into a written agreement with the Company that provides that C-BASS shall not without prior written consent from the Company'

23

Board of Managers (which consent may be given or withheld, conditioned or delayed as the Board of Managers may determine in its sole discretion) sell, assign or transfer any ownership interest or equity security in such Subsidiary to any person or entity so long as any Interests are owned by such Subsidiary (and any violation thereof shall result in conversion of the Subsidiary's Membership Interest into an Economic Interest and termination of the Unanimous Approval provision set forth in Section 5.1(g) above); (3) the Subsidiary shall enter into a written agreement with the Company that provides that such Subsidiary shall not without prior written consent from the Company' Board of Managers (which consent may be given or withheld, conditioned or delayed as the Board of Managers may determine in its sole discretion) issue any equity interest or other security in the Subsidiary to any person or entity (other than C-BASS), or enter into a merger, reorganization, recapitalization or similar transaction, so long as any Interests are owned by such Subsidiary, (and any violation thereof shall result in conversion of the Subsidiary's Membership Interest into an Economic Interest and termination of the Unanimous Approval provision set forth in Section 5.1(g) above); and (4) the Subsidiary shall execute this Agreement, become a party hereto and a Member in the Company. If C-BASS elects to execute a Subsidiary Transfer it shall provide thirty days' prior written notice of such intention to the Board of Manager. Prior to the effectiveness of such Subsidiary Transfer, (i) C-BASS shall cause the Subsidiary to become a party to the Operating Agreement and (ii) a Majority In Interest of Members (excluding C-BASS) shall approve the terms of the written agreements described above in items (1) and (2) of this paragraph, which approval shall not be unreasonably withheld or delayed.

7.3     Further Restrictions on Transfer of Membership Interests.  In addition to any other restrictions found in this Agreement, no Member may Transfer its Membership Interest or any part thereof (i) without compliance with the Securities Act, the California Corporate Securities Law of 1968 and any other applicable securities laws (ii) if the Transfer could result in the Company not being classified as a partnership for federal or state income tax purposes, in each case as determined by the Managers.  Any attempted or purported Transfer in violation of this Section 7.3 shall be null and void ab initio, and the transferee shall not become either a Member or a holder of an Economic Interest.

7.4     Transfer.  No Member shall sell, assign, transfer, pledge, encumber or in any other manner whatsoever, alienate or dispose of any or all of a Membership Interest at any time owned by or standing in the name of such Member, including any Membership Interest hereafter issued to any Member either in accordance with the terms of this Agreement, by reason of any merger, consolidation, reorganization or recapitalization of the Company or otherwise, except:

> (a)     transfers to the Company or to another Member;
> (b)     transfers by Chris Farrar to an FLP or Company employee (including without limitation as part of the compensation package being provided to a new employee) so long as he will own a 38% Percentage Interest, or greater, after any such transfer; and

         (c)     transfers pursuant to and in compliance with Section 7.2 and Section 7.6 (all of the foregoing, collectively, "Permitted Transfers").

The transferee of a Permitted Transfer is referred to herein as a "Permitted Transferee."  Any Membership Interest transferred by any Member shall continue to be subject in all respects to the terms, conditions and provisions of this Agreement and any transfers as permitted hereunder shall be conditioned upon any such Permitted Transferee executing this Agreement and becoming a party hereto.

7.5     Substitution of Members.  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.2 and/or Section 7.6 relating to Permitted Transfers, securities and tax requirements hereof are met, (ii) such transferee Person executes an instrument in form and substance satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such Person pays any reasonable expenses in connection with his or her admission as a new Member.  The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.6     No Effect to Transfers in Violation of Agreement.  Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to own an Economic Interest and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a credit of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote on matters under this Agreement), the Company shall purchase from the Member, and the Member shall sell to the Company for a purchase price of ten dollars ($10), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest.  Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.  Each member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article Seven is not unreasonable under the circumstances existing as of the date hereof.

7.7     Right of First Refusal and Tag-along Right.  If a Member shall desire to transfer, assign, convey, sell or dispose of all or any part of his or her Membership Interest (or as required by operation of law or other involuntary transfer to do so) (collectively, "Transfer") other than pursuant to Sections 7.4, then prior thereto such Member shall first obtain a bona fide offer for the sale for cash of such Membership Interest.  The Member desiring to effect the Transfer (the "Selling Member") shall first offer such Membership Interest to the other Members (the "Non-Transferring Members") in accordance with the following provisions:

(a)     The Selling Member shall deliver a written notice (the "Notice") to the Company and the Non-Transferring Members stating (i) such Member's bona fide intention to transfer such Membership Interest, (ii) the name and address of the proposed transferee, (iii) the Membership Interest to be transferred, and (iv) the purchase price and terms of payment for which the Member proposes to transfer such Membership Interest.

(b)     Non-Transferring Member(s) shall have the option for thirty (30) days after receipt of the Notice (the "Option Period") of notifying the Company in writing of its desire to purchase a portion of the Membership Interest being so transferred.  The purchase prices shall be the same as set forth in the Notice (adjusted appropriately to reflect any partial purchase of the Membership Interest).  The failure of any Non-Transferring Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest that may be so transferred.

Each Non-Transferring Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Non-Transferring Members electing to so purchase the Membership Interest being transferred (e.g., if only one Member elects to purchase the Selling Member's Membership Interest, such Member may purchase the entire Membership Interest). In the event any Non-Transferring Member elects to purchase less than all of his or her pro rata share of such Membership Interest pursuant to the immediately preceding sentence, then the other Non-Transferring Members can elect to purchase more than their pro rata share and purchase such portion that is not subscribed for in proportion that the Percentage Interest of each of the Members electing to purchase the maximum amount permitted bears to the Percentage Interests of all of the Members electing to so purchase the maximum amount permitted of the Membership Interest.

(c)     To the extent any Non-Transferring Member elects not to purchase any portion of the Membership Interest, such Non-Transferring Member can elect to sell to the third party buyer(s) specified in the Notice a percentage of the Membership Interest that the Selling Member proposes to transfer equal to such Non-Transferring Member's Percentage Interest, which sale shall be at the same relative price (including type of consideration to be paid) and terms of sale specified in the Notice; provided, however, that the aggregate Membership Interest sold to such third party buyer(s) by all Members pursuant to this Section shall not exceed the total amount that the Selling Member proposes to Transfer. (For example: if the Selling Member desires to sell 1,000 Class A Units to the buyer, and such Non-Transferring Member owns a 10% Percentage Interest in the Company, pursuant to the foregoing such Non-Transferring Member may elect to sell to the buyer 100 Class A Units owned by the Non-Transferring Member.)

(d)     The closing of the purchase of that portion of the Selling Member's Membership Interest subscribed for by the Non-Transferring Members under the foregoing provisions of this Section 7.7 shall be held at the principal executive office of the Company on the 10th business day after the end of the Option Period, or at such other time and place as the parties to the transaction may agree upon (collectively, the "Closing Date").

At such closing, (1) the Selling Member shall deliver one or more assignment separate from certificate (as necessary for the purchaser or purchasers, as the case may be) for the Membership Interest being purchased, duly endorsed for transfer and accompanied by all requisite transfer taxes, if any; (2) the Selling Member shall represent and warrant in writing (which shall survive the closing) to each purchaser that such Membership Interest being purchased is free and clear of any liens, claims, options, charges, encumbrances or rights ("Liens") (other than those existing under this Agreement) and that the Selling Member is the sole beneficial and record owner of such Membership Interest. The Non-Transferring Members that are purchasing the Membership Interest, as applicable, shall deliver the purchase price at the closing which purchase price shall include immediately available funds for any cash portion thereof. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(e)     If the Non-Transferring Members elect not to purchase all of the Membership Interest designated in the Notice, then the Selling Member may transfer pursuant to the terms described in the Notice to the proposed transferee described in the Notice, that portion of the Selling Member's Membership Interest not purchased by the Non-Transferring Members, provided that such transfer: (i) is completed within thirty (30) days after (a) if none of the Non-Transferring Members elect to purchase any of the Membership Interest, that end of the Option Period, or (b) if one or more of the Non-Transferring Members elect to purchase some portion of the Membership Interest, then that date on which such closing

took place; (ii) is made on price and terms no less favorable to the Selling Member than as designated in the Notice; and (iii) the requirements of Sections 7.7 are met.

(f)  In the event that the Non-Transferring Members do not exercise their options to purchase the Membership Interest, and the Selling Member has not sold the Membership Interest by the time provided in item (d) above, or if such Selling Member Shareholder withdraws the Notice, then such Selling Member may not give another Notice, and shall not endeavor to effect a Transfer pursuant to this Section 7.7, for a period of 120 calendar days from the date of the previous Notice.

(g)  Notwithstanding anything in this Agreement to the contrary, no Transfer of any Membership Interest other than a Transfer to a Permitted Transferee is effective unless such Transfer is made (i) pursuant to an effective registration statement under the Securities Act and a valid qualification under applicable state securities or blue sky laws, or (ii) without registration under the Securities Act and qualification under applicable state securities or blue sky laws as a result of the availability of an exemption from registration and qualification under such laws, and, unless waived by the Company in writing, the Transferring Shareholder shall have furnished the Company an opinion of counsel, such counsel and such opinion being reasonably acceptable to the Company and its counsel, to that effect.

7.8  Pre-Emptive Rights. Except for Units issued upon the exercise of any options granted under the Option Pool, the Company shall not issue any Units or enter into any transaction which will have the effect of lowering the aggregate Percentage Interest of any Member, including, without limitation, the issuance of any warrant, option (other than under the Option Pool) or other security convertible into or exercisable for such Units, or enter into any agreement with respect to such issuance, other than: (i) in connection with a transaction with a party other than a Member or any of their Affiliates, pursuant to which the Company offers to each of the Members the right to participate proportionately in accordance with its Percentage Interest as of the date of such proposed issuance and on the same terms and conditions as such proposed issuance; or (ii) in connection with any transaction in which one or more Members or any of their Affiliates make an additional Capital Contribution, pursuant to which the Company offers to each Member the right to participate in such transaction proportionately in accordance with the ratio of each such Member's Percentage Interest to the Percentage Interest of all other Members making additional Capital Contributions in such transaction. Any right granted pursuant to clause (i) or (ii) of the preceding sentence shall be exercisable by written notice to the Company given within ten (10) business days after receipt by the Members of written notice of such proposed issuance. If any Member shall fail to respond to the Company within such ten (10) business day notice period, such failure shall be deemed to be a rejection by such Member of its right to participate in the purchase of the securities to be issued or in the additional Capital Contribution, as applicable.

7.9  Piggyback Registration Rights. Until such time as all of C-BASS' Units, or, if the Company has already converted into a corporation pursuant to Article XI hereof, C-BASS' equity securities (and with together the Units, as the context requires, the "Securities"), are registered pursuant to the Securities Act and sold by C-BASS, if the Company proposes to file a registration statement under the Securities Act ("Registration Statement") in order to register the public sale of Units or equity securities (other than any registration on Form S-8 or any successor Form utilized in connection with registration of securities for issuance pursuant to employee stock option plans), it will give written notice to C-BASS at least fifteen (15) days prior to the date of filing of the proposed Registration Statement. Upon written request by C-BASS, within ten (10) days after receipt of such notice, the Company will include in the securities to be registered by such Registration Statement all

27

of the Securities which have not previously been registered by the Company and sold by C-BASS that C-BASS desires to sell, subject to the following:

(a)     The Company (or any other party agreeing to pay such expenses) will pay the expense of such registration, except that C-BASS shall pay all underwriting discounts and commissions applicable to its Securities and all legal fees and expenses of its own legal counsel, if any.

(b)     The Company shall not have received an opinion its legal counsel, such counsel and opinion being reasonably acceptable to C-BASS and its counsel, stating that registration under the Securities Act of the Securities proposed to be sold or otherwise disposed of by C-BASS, in the manner proposed to be sold or otherwise disposal of by C-BASS, is not required as a matter of law.

(c)     If such Registration Statement is for a prospective underwritten offering, C-BASS agrees to sell its Securities, if the Company so requests, on the same basis as the other securities covered by such Registration Statement are being sold, and will enter into an underwriting agreement in connection therewith (as a "selling shareholder" thereunder) with customary terms and conditions.

(d)     C-BASS agrees that it will promptly upon following any request therefor by the Company or its underwriter, provide in writing to such party that information requested that is customarily provided by "selling shareholders" for inclusion in the Registration Statement.

The Company may withdraw any such Registration Statement before it becomes effective or postpone the offering of securities contemplated by such Registration Statement without any obligation to C-BASS. If such Registration Statement is for a prospective underwritten offering by the Company for its own account, and, in the reasonable opinion of the prospective managing underwriter, the inclusion in the Registration Statement of part or all of the Securities requested by C-BASS would be unduly detrimental to the underwriters' ability to complete the proposed offering on reasonable terms, the Company may reduce the amount of Securities from C-BASS to be included in the Registration Statement

## ARTICLE VIII
## CONSEQUENCES OF MEMBERSHIP TERMINATION EVENTS

8.1     Dissolution of Company.  The occurrence of a Membership Termination Event as to any Member other than the last and only remaining Member shall not dissolve the Company.  Upon the occurrence of a Membership Termination Event as to the last and only remaining Member, the Company shall dissolve unless the Managers and the personal representative or other successor-in-interest of the last and only remaining Member consent in writing within ninety (90) days of that Membership Termination Event to the continuation of the Company and to the admission of such personal representative or other successor-in-interest, or its designee or nominee, as a Member.

8.2     Admission or Conversion.  Upon the occurrence of a Membership Termination Event with respect to a Member under circumstances where the Company does not dissolve, the Manager shall determine which one of the following shall occur and give written notice thereof to the remaining Members and to the Member who suffered the Membership Termination Event (the "Former Member"):

(a)     the Former Member's personal representative or other successor-in-interest shall be admitted as a Member of the Company in the place and stead of the Former Member to the extent of the Membership Interest of the Former Member (the "Former Member's Interest"); or

(b)     the Former Member's Interest shall be converted to a bare Economic Interest, and the Former Member's representative or other successor-in-interest shall become the owner of that Economic Interest.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1     Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with such method of accounting as shall be determined by the Board of Managers.  The books and records of the Company shall reflect all the Company transactions recognizable under the basis of accounting determined by the Board of Managers and shall be appropriate and adequate for the Company's business.  Each Member and its duly authorized representative shall have complete access to all such books and records at any time.

9.2     Bank Accounts; Invested Funds.  All funds of the Company shall be deposited in such account or accounts of the Company as may be determined by the Board of Managers and shall not be commingled with the funds of any other Person.  All withdrawals therefrom shall be made upon checks signed by such persons and in such manner as the Board of Managers may determine.  Temporary surplus funds of the Company may be invested in commercial paper, time deposits, short-term government obligations or other investments determined by the Board of Managers.

9.3     Tax Matters for the Company Handled by Board of Managers.  The Board of Managers shall from time to time cause the Company to make such tax elections as it deems to be in the best interests of the Company and the Members.  The Board of Managers shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend Company funds for professional services and costs associated therewith.  The Board of Managers shall oversee the Company's tax affairs in the overall best interests of the Company.

9.4     Accounting Matters.  All decisions as to accounting matters shall be made by the Board of Managers.

9.5     Reports.  Each Member shall be furnished with:  (a) quarterly unaudited financial statements relating to the operations of the Company no later than forty-five (45) days following the end of each of the first three quarters of each fiscal year, (b) annual audited financial statements relating to the operations of the Company,  no later than ninety (90) days following the end of each fiscal year and (c) such other reports as are required to be given to Members by any governmental authority which has jurisdiction over the activities of the Company or as any Member may reasonably request.

9.6     Confidentiality.  All books, records, financial statements, tax returns, budgets, business plans and projections of the Company, all other information concerning the business, affairs and properties of the Company and all of the terms and provisions of this Agreement shall be held in confidence by the Managers and the Members and their respective Affiliates, subject to any obligation to comply with (a) any applicable law, (b) any rule or regulation of any legal authority or securities

exchange or (c) any subpoena or other legal process to make information available to the Persons entitled thereto. Such confidentiality shall be maintained to the same degree as each Manager or Member maintains its own confidential information and shall be maintained until such time, if any, as any such confidential information either is, or becomes, published or a matter of public knowledge.

## ARTICLE X
## DISSOLUTION AND WINDING UP

10.1    Dissolution. The Company shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

(a)    the expiration of the term of the Company specified in the Certificate of Formation or any other event of dissolution specified in the Certificate of Formation;

(b)    the Board of Managers determines it is in the best interest of the Company;

(c)    the occurrence of a Membership Termination Event as to the last and only remaining Member if the Managers and that Member's personal representative or other successor-in-interest fail to consent to the continuation of the Company in accordance with Section 8.1 within ninety (90) days after the occurrence of that event;

(d)    the sale of all or substantially all of the assets of the Company;

(e)    the Bankruptcy of the Company;

(f)    the occurrence of an event which makes it unlawful for the business of the Company to be continued;

(g)    all Members so determine in writing.

10.2    Date of Dissolution. Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company have been liquidated and distributed as provided herein. Notwithstanding the dissolution of the Company, prior to the termination of the Company the business of the Company and the rights and obligations of the Members, as such, shall continue to be governed by this Agreement.

10.3    Winding Up. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Board of Managers shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities and assets of the Company, shall cause its assets either to be sold or distributed, as the Board of Managers may determine, and shall cause the proceeds therefrom, to the extent sufficient, to be applied and distributed as provided in Section 10.5.

10.4    Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if that asset had been sold for that value, the Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect those allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in the distributed asset shall be the fair market value of the interest (net of any liability secured by the asset

that the Member assumes or takes subject to). The fair market value of that asset shall be determined by the Board of Managers.

10.5   Order of Payment of Proceeds Upon Dissolution.

(a)   Liquidating Distributions. After determining that all known debts and liabilities of the Company, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall promptly be distributed (1) to the Class A Members until such time they have received (together with all previous distributions pursuant to Article VI above) aggregate Distributions (not including Tax Distributions) equal to 100% of the amount of their Capital Contributions to the Company for their Class A Membership Interest and (2) to the Members pro rata in accordance with their Percentage Interests.

(b)   No Liability. No Member shall have any liability to the Company, any Member or any creditor of the Company on account of any deficit balance in its Capital Account.

10.6   No Liability. Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a negative deficit Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), neither that Member nor the Managers shall have any obligation to make any contribution to the capital of the Company, and the negative balance of that Member's Capital Account shall not be considered a debt owned by that Member or the Managers to the Company or to any other person for any purpose whatsoever.

10.7   Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of that Member's positive Capital Account balance and shall have no recourse for its Capital Contributions and/or share of Net Profits (upon dissolution or otherwise) against the Managers or any other Member.

10.8   Certificate of Cancellation. Upon completion of the winding up of the Company's affairs, the Manager shall cause a certificate of cancellation to be filed with the California Secretary of State.

10.9   Compensation for Services. The Persons winding up the affairs of the Company shall be entitled to reasonable compensation from the Company for their services.

10.10   No Action for Dissolution. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should voluntarily cause a Membership Termination Event or bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. The Members further acknowledge that this Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment upon the liquidation of the Membership Interests. Accordingly, except as expressly permitted in this Agreement, no Member shall take any voluntary action that directly causes the Company to dissolve, and unless the Manager shall fail to liquidate the Company as required by this Article X, each Member waives and renounces its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that it is not reasonably practicable to carry on the business of the Company

31

in conformity with the Certificate of Formation or this Agreement or that dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member.

## ARTICLE XI
## CONVERSION

11.1    Conversion to a Corporation. The Board of Managers shall have the exclusive power and authority to effectuate a Conversion of the Company to a corporation (subject to certain approval requirements set forth in Section 5.1(g) above).

11.2    Conversion Formula. In the event that the Board of Managers determines it is in the best interest of the Company to effectuate a Conversion of the Company to a corporation each Member's Units will be converted equally, on a pro rata basis, into common stock of the corporation. There shall be only one class of common stock into which all Class A and Class B Interests shall convert. The Members acknowledge that the conversion of Units into common stock will be based solely on each Member's relative Percentage Interest rather than each Member's Capital Contribution.

11.3    Shareholder Agreement. In the event of a Conversion, each Member hereby agrees to execute a shareholder agreement in a form acceptable by the Board of Managers (a "Shareholders Agreement"), which will contain the same material provisions contained in this Agreement, to the extent permitted by law, with the exception of the Class A Member and Class B Member distinctions defined in Article IV. Such Shareholder Agreement shall terminate upon an initial public offering of the corporation's stock.

11.4    Vesting of Equity. In the event that a Member's Membership Interest is subject to a vesting schedule and/or vesting provisions, such vesting schedule and or vesting provisions will remain in effect during and after the Conversion.

11.5    Further Assurances. In the event of a Conversion, each Member hereby agrees to execute and deliver any documents and/or instruments as may be reasonably required by the Company to consummate or otherwise implement the Conversion. Execution of such Shareholder Agreements and other documents and/or instruments shall be a condition precedent to a Member's receipt of their stock certificate from the new corporation.

## ARTICLE XII
## INDEMNIFICATION

12.1    Indemnification. The Company shall indemnify and hold harmless each of the Members and Managers and officers, and each of their respective officers, directors, shareholders, partners, members, trustees, beneficiaries, employees, agents, heirs, assigns, successors-in-interest and Affiliates, (collectively, "Indemnified Persons") from and against any and all losses, damages, liabilities and expenses, (including costs and reasonable attorneys' fees), judgments, fines, settlements and other amounts (collectively "Liabilities") reasonably incurred by any such Indemnified Person in connection with the defense or disposition of any action, suit or other proceeding, whether civil, criminal, administrative or investigative and whether threatened, pending or completed (collectively a "Proceeding"), in which any such Indemnified Person may be involved or with which any such Indemnified Person may be threatened, with respect to or arising out of any act performed by the Indemnified Person or any omission or failure to act if (a) the performance of the act or the omission or failure was done in good faith and within the scope of the authority conferred upon the Indemnified Person by this Agreement or by the Act, except for acts of willful misconduct, gross negligence or

32

reckless disregard of duty, or acts which constitute a material breach of this Agreement and from which such Indemnified Person derived an improper personal benefit or (b) a court of competent jurisdiction determines upon application that, in view of all of the circumstances, the Indemnified Person is fairly and reasonably entitled to indemnification from the Company for such Liabilities as such court may deem proper. The Company's indemnification obligations hereunder shall apply not only with respect to any Proceeding brought by the Company or a Member but also with respect to any Proceeding brought by a third party.

12.2     Limitation of Liability. The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, Manager or officer of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Manager and/or officer.

12.3     Contract Right; Expenses. The right to indemnification conferred in this Article XII shall be a contract right and shall include the right to require the Company to advance the expenses incurred by the Indemnified Person in defending any such Proceeding in advance of its final disposition; provided, however, that, if the Act so requires, the payment of such expenses in advance of the final disposition of a Proceeding shall be made only upon receipt by the Company of an undertaking, by or on behalf of the Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Person is not entitled to be indemnified under this Article XII or otherwise.

12.4     Indemnification of Officers and Employees.     The Company may, to the extent authorized from time to time by the Board of Managers, grant rights to indemnification and to advancement of expenses to any officer, employee or agent of the Company to the fullest extent of the provisions of this Article XII with respect to the indemnification and advancement of expenses of Members and Managers of the Company.

12.5     Insurance. The Company may purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against that Person and incurred by that Person in any such capacity or arising out of that Person's status as an agent, whether or not the Company would have the power to indemnify that Person against liability under the provisions of this Article or under applicable law.

12.6     Nonexclusive Right. The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article XII shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute or agreement, or under any insurance policy obtained for the benefit of the Managers, the Members and/or the officers of the Company.

12.7          Severability. If any provision of this Article XII is determined to be unenforceable in whole or in part, such provision shall nonetheless be enforced to the fullest extent permissible, it being the intent of this Article XII to provide indemnification to all Persons eligible hereunder to the fullest extent permitted under law.

## ARTICLE XIII
## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to the Manager, the other Members and the Company as follows:

13.1    Preexisting Relationship or Experience.  (a) The Member has a preexisting personal or business relationship with the Company or one or more of its Managers, officers or control persons or (b) by reason of the Member's business or financial experience, the Member is capable of evaluating the risks and merits of an investment in its Membership Interest and of protecting the Member's own interests in connection with the investment.

13.2    Access to Information.  The Member has had an opportunity to review all documents, records and books pertaining to this investment and has been given the opportunity to consult with counsel of his or her choice with respect to all aspects of this investment and the Company's proposed business activities.  Such Member has personally met with the Managers and has been provided with such information as may have been requested and has at all times been given the opportunity to obtain additional information necessary to verify the accuracy of the information received and the opportunity to ask questions of and receive answers from the Managers concerning the terms and conditions of the investment and the nature and prospects of the Company's business.

13.3    Economic Risk; Investment Risk.  The Member is financially able to bear the economic risk of an investment in its Membership Interest, including the total loss thereof.  THE MEMBER ACKNOWLEDGES THAT THE MEMBERSHIP INTEREST IS A SPECULATIVE INVESTMENT WHICH INVOLVES A HIGH DEGREE OF RISK OF LOSS BY HIM OR HER OF HIS OR HER ENTIRE INVESTMENT IN THE COMPANY, THAT HE OR SHE UNDERSTANDS AND TAKES FULL COGNIZANCE OF THE NUMEROUS RISKS RELATED TO THE PURCHASE OF THE MEMBERSHIP INTEREST, AND THAT THE COMPANY IS RECENTLY ORGANIZED AND HAS A LIMITED OPERATING HISTORY.  THE MEMBER UNDERSTANDS AND AGREES THAT THE COMPANY'S BUSINESS IS A HIGHLY RISKY AND COMPETITIVE AREA OF BUSINESS, AND THAT THE COMPANY COMPETES AGAINST COMPANIES THAT ARE MUCH LARGER, WELL-ESTABLISHED AND BETTER CAPITALIZED.  THERE CAN BE NO ASSURANCE WHATSOEVER THAT THE COMPANY WILL BE VIABLE OR SUCCESSFUL IN ITS BUSINESS.

13.4    Investment Intent.  The Member is acquiring its Membership Interest for investment purposes and for the Member's own account only and not with a view to, or for sale in connection with, any distribution of all or any part of its Membership Interest.  Except for the partners or members of the Member, no other Person will have any direct or indirect beneficial interest in, or right to, its Membership Interest.

13.5    Consultation with Attorney.  The Member has been advised to consult with its own attorney regarding all legal and tax matters concerning an investment in its Membership Interest and has done so to the extent it considers necessary.

13.6    Purpose of Entity.  If the Member is a corporation, partnership, limited liability company, trust or other entity, it was not organized for the specific purpose of acquiring its Membership Interest.

34

13.7 <u>No Advertising</u>. The Member has not seen, received or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement or any other form of advertising or general solicitation with respect to the purchase of its Membership Interest.

13.8 <u>Membership Interest is Restricted Security</u>. The Member understands that its Membership Interest is a "restricted security" under the Securities Act of 1933 in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, that its Membership Interest may be resold without registration under the Securities Act of 1933 only in certain limited circumstances and that otherwise its Membership Interest must be held indefinitely.

13.9 <u>No Registration of Membership Interest</u>. The Member understands that the Company and the Manager are under no obligation to register, or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or her in complying with any exemption from registration and qualification.

13.10 <u>No Disposition in Violation of Law; Restrictions</u>. Without limiting the representations set forth above, and without limiting Article Seven of this Agreement, the Member will not make any disposition of all or any part of the Membership Interest which will result in the violation by such Member or by the Company of the Securities Act or any applicable securities laws. Without limiting the foregoing, such Member agrees not to make any disposition of all or any part of the Membership Interest unless and until: (a) there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or (b) (i) such Member has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and (ii) if reasonably requested by the Manager, such Member has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law. Each Member acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for such Member to liquidate his or her investment in the Company.

13.11 <u>Information Reviewed</u>. The Member has received and reviewed all information he or she considers necessary or appropriate for deciding whether to purchase the Membership Interest.

13.12 <u>No Representations By Company</u>. Neither the Manager, any agent or employee of the Company or of any Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to such Member that such Member may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Managers or their affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

13.13 <u>Tax Consequences</u>. The Member acknowledges that the tax consequences to such Member of investing in the Company will depend on such Member's particular circumstances, and neither the Company, the Managers, the Members, nor the partners, shareholders, members, managers,

agents, officers, directors, employees, affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him or her of an investment in the Company. The Member will look solely to, and rely upon, his or her own advisers with respect to the tax consequences of this investment. Further, the Member acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

## ARTICLE XIV
## MASTER MORTGAGE LOAN PURCHASE AGREEMENT

C-BASS acknowledges that its entering into the Master Mortgage Loan Purchase Agreement with the Company was a material inducement to the Company to (1) allow C-BASS to purchase its Membership Interest in the Company and (2) amend and restate this Agreement and grant C-BASS the rights set forth under Section 5.1 herein; and the Company acknowledges that its admission of C-BASS as a Member pursuant to the terms of this amended and restated Agreement was a material inducement to C-BASS to enter into Master Mortgage Loan Purchase Agreement.

## ARTICLE XV
## MISCELLANEOUS

15.1    Amendments. This Agreement may be altered, amended or repealed and a new Operating Agreement may be adopted only by approval of Members that own (in the aggregate) at least a 66-2/3% Percentage Interest.

15.2    Offset Privilege. Any monetary obligation owing from the Company to any Member or Manager may be offset by the Company against any monetary obligation then owing from that Member or Manager to the Company.

15.3    Arbitration.

(a)    General. Other than disputes, actions and/or proceedings described under Article XIV, in the event of any dispute, claim or controversy among the parties arising out of or relating to this Agreement or the Articles of Organization, whether in contract, tort, equity or otherwise, and whether relating to the meaning, interpretation, effect, validity, performance or enforcement of this Agreement or the Articles of Organization, such dispute, claim or controversy shall be resolved by and through an arbitration proceeding to be conducted under the auspices and the commercial arbitration rules of the American Arbitration Association (or any like organization successor thereto) at Los Angeles, California. The arbitrability of the dispute, claim or controversy shall likewise be determined in the arbitration. The arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of the American Arbitration Association. Both the foregoing agreement of the parties to arbitrate any and all such disputes, claims and controversies, and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the parties and may be specifically enforced by legal proceedings in any court of competent jurisdiction.

(b)    Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the state of California (without regard to its conflict of laws principles).

(c)     Costs of Arbitration.  The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, each party's attorneys' fees and costs), shall be borne by the unsuccessful party or, at the discretion of the arbitrator(s), may be prorated between the parties in such proportion as the arbitrator(s) determines to be equitable and shall be awarded as part of the arbitrator's award.

15.4     Notices.  Any notice to be given to the Company or any Member in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice by courier, Federal Express or other means of personal service, when received if sent by facsimile and confirmed via Federal Express, or three (3) days after deposit of the notice by first class mail, postage prepaid, or certified mail, return receipt requested.  Any such notice must be given to the Company at its principal place of business, and to any Member at the address specified in Exhibit A.  Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address as the new address to which notice must be given.

15.5     Remedies Cumulative.  Except as otherwise provided herein, the remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

15.6     Attorney's Fees.  In the event that any dispute between the Company and/or the Members, the prevailing party in that dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, subject, however to the provisions of Section 14.3(c).

15.7     Jurisdiction.  Each Member consents to the exclusive jurisdiction of the state and federal courts sitting in Los Angeles, California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement, if such claim is not required to be arbitrated pursuant to Section 14.3.  Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 14.4 and that when so made shall be as if served upon it personally.

15.8     Complete Agreement.     This Agreement, the Master Mortgage Loan Purchase Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members with respect to their respective subject matters and supersede all prior written and oral agreements or statements by and among the Members.  No representation, statement, condition or warranty not contained in this Agreement or the Certificate of Formation shall be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the Certificate of Formation conflicts with any provision of this Agreement, the Certificate of Formation shall control.

15.9     Binding Effect.  Subject to the provisions of this Agreement relating to Transferability, this Agreement shall be binding upon and inure to the benefit of the Members and their respective successors and assigns.

15.10   Section Headings.  All Section headings are inserted only for convenience of reference and are not to be considered in the interpretation or construction of any provision of this Agreement.

15.11 No Third Party Rights. No Person other than a Member, a Manager or a Person entitled to indemnification pursuant to Article XI shall have any legal or equitable right, remedy or claim, or be a beneficiary, under or in respect of this Agreement.

15.12 Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or that Member's counsel.

15.13 Severability. If any provision of this Agreement or the application of that provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of that provision to persons or circumstances other than those to which it is held invalid shall not be affected.

15.14 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

15.15 Legends. Any certificates that may be issued evidencing the Membership Interest Units may bear one or all of the following legends (in such form as determined by the Manager):

> (a) "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, ASSIGNED, TRANSFERRED, PLEDGED, HYPOTHECATED OR ENCUMBERED (COLLECTIVELY REFERRED TO AS A "TRANSFER") UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.
>
> ANY TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH IN THAT CERTAIN OPERATING AGREEMENT DATED JULY 12, 2004, AS AMENDED FROM TIME TO TIME, BY AND AMONG THE COMPANY AND ITS MEMBERS (WHICH IS ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL PLACE OF BUSINESS OF THE COMPANY)."

(b)    Any legend required by applicable state securities laws.

[signature page to follow]

IN WITNESS WHEREOF, all of the Members of Velocity Commercial Capital, LLC, a California limited liability company, have executed this Agreement, effective as of the date first written above.

_____
Chris Farrar, Member


_____
Jennifer Tymczyn, Member


_____
Richard Herrin, Member


_____
Tom Kolefas, Member


_____
Dave McGee, Member


_____
Jeffrey Taylor, Member

CREDIT-BASED ASSET SECURITIZATION
AND SERVICING, LLC.


By: _____
    Name: _____
    Title: _____

39

**EXHIBIT A to Operating Agreement**

## MEMBERSHIP INTERESTS

| Name of Member | Membership Interest Units | Percentage Interest in LLC | Capital Contributions |
|---|---|---|---|
| *CLASS A MEMBERS* | | | |
| Chris Farrar | 885,000 | 61.95% | $2,000,000 |
| Jennifer Tymczyn | 10,000 | 0.70% | $100,000 |
| Tom Kolefas | 20,000 | 1.40% | $200,000 |
| Dave McGee | 20,000 | 1.40% | $200,000 |
| C-BASS | 428,571 | 30.00% | $3,000,000 |
| | | | |
| *CLASS B MEMBERS* | | | |
| Richard Herrin* | 32,500 | 2.275% | $0 |
| Jeffrey Taylor* | 32,500 | 2.275% | $0 |
| | | | |
| | 1,428,571 | 100% | $5,500,000 |

* Subject to repurchase rights by the Company as follows: (a) 10,000 Units will no longer be subject to repurchase as of July 12, 2005, provided that such executive is employed by the Company as of such date; and (b) 10,000 Units will no longer be subject to repurchase as of July 12, 2006, provided that such executive is employed by the Company as of such date; and (c) the remaining 12,500 Units will no longer be subject to repurchase as of July 12, 2007, provided that such executive is employed by the Company as of such date.

**EXHIBIT B to Operating Agreement**

**Managers of the Company**

MANAGER                                        APPOINTED BY MEMBER(S):

1. Chris Farrar                                All Members other than C-BASS

2. Jeffrey Taylor                              All Members other than C-BASS

3. Jeff Toll                                   C-BASS

41

**EXHIBIT C to Operating Agreement**

**Senior Executive Officers of the Company**

1. Chris Farrar – President

2. Richard Herrin - EVP, Chief Operating Officer

3. Jeffrey Taylor - EVP, Capital Markets

4. Jack Sutton, SVP/Loan Operations Manager

5. Neil Beldock, SVP, National Sales Manager

6. Thomas Capola – SVP Finance / East Coast Regional Director

# EXHIBIT 2



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
DENVER REGIONAL OFFICE
1801 CALIFORNIA STREET
SUITE 1500
DENVER, COLORADO 80202-2656

In replying
please quote

D-02762-A

February 18, 2008

Jason R. Pickholz
335 Madison Avenue
Suite 2600
New York, NY 10017-4636

### Re: *In the Matter of Joe Cowell (D-02762-A)*

Dear Mr. Pickholz:

This investigation has been completed as to Thomas Capola, against whom we do not intend to recommend any enforcement action by the Commission. We are providing this information under the guidelines in the final paragraph of Securities Act Release No. 5310 (copy attached).

Very truly yours,

*Mary S. Brady*

Mary S. Brady
Assistant Regional Director - Enforcement

Enclosure: As stated

# EXHIBIT 3

Capola, Angelica

| From: | Paulo Melo [paulsoc17@yahoo.com] |
| Sent: | Friday, December 08, 2006 11:16 AM |
| To: | Capola, Angelica |
| Cc: | Thomas Capola |
| Subject: | RE: website... |

Well, i know for a fact that we are funding through Velocity because zach charged 3.25%
origination fee on this loan and everyone in the office was pissed because he can and we
can't. So i know itd being funded through Velocity. I just think that zach has side deal
with all these correspondece where he collects from them and sends them deal we can't
do...
-Paulo

--- "Capola, Angelica" <Angelica.Capola@lehman.com>
wrote:

>
> Are you sure they're funding through VCC?  Or are they having VCC
> employees do the work and then sending it to Southeastern guys to fund
> the loan with all the completed paperwork?  Do they have separate loan
> sheets for their Southeast Mortgage Partners deals?
> Or do they just kick
> deals over to lenders and collect a fee just for passing the loan on
> to them?  Do you know how it's working out?
>
> -----Original Message-----
> From: Paulo Melo [mailto:paulsoc17@yahoo.com]
> Sent: Friday, December 08, 2006 11:07 AM
> To: Capola, Angelica
> Cc: Thomas Capola
> Subject: RE: website...
>
> But VCC is getting paid on them...Its just our loan worksheet...They
> are funding the loan through velocity...
> -Paulo
>
> --- "Capola, Angelica" <Angelica.Capola@lehman.com>
> wrote:
>
> >
> > If you can -- make a copy of that sheet so they
> can see VCC employees
> > are doing the work on these loans but the co --
> meaning VCC -- is not
> > getting paid on them.  That won't fly with the
> board.  xoxoo
> >
> > -----Original Message-----
> > From: Paulo Melo [mailto:paulsoc17@yahoo.com]
> > Sent: Friday, December 08, 2006 10:53 AM
> > To: Capola, Angelica
> > Cc: Thomas Capola
> > Subject: RE: website...
> >
> > I'm just going off the phone number in Velocity's
> loan worksheet and
> > once i googled that that website came up with that
> company. So its
> > definitely that company. I think they are a legit
> correspondece, but
> > there is some agreement between the trio and
> southeast...just sound

1

```
> current
> > > mess.
> > > >
> > > > Thomas Capola
> > > > Managing Partner
> > > > Porter Capital LLC
> > > >
> > > > -----Original Message-----
> > > > From: Paulo Melo [mailto:paulsoc17@yahoo.com]
> > > > Sent: Friday, December 08, 2006 9:53 AM
> > > > To: tcapola@porter-capital.com
> > > > Subject: RE: website...
> > > >
> > > > seriously
> > > >
> > > > --- Thomas Capola <tcapola@porter-capital.com>
> > > > wrote:
> > > >
> > > > > Lol.....
> > > > >
> > > > > Thomas Capola
> > > > > Managing Partner
> > > > > Porter Capital LLC                              :
> > > > >
> > > > > -----Original Message-----
> > > > > From: Paulo Melo
> [mailto:paulsoc17@yahoo.com]
> > > > > Sent: Friday, December 08, 2006 9:13 AM
> > > > > To: tcapola@porter-capital.com
> > > > > Subject: RE: website...
> > > > >
> > > > > This hot dog better be made out of gold and
> > weigh about 25 lbs...
> > > > >
> > > > > --- Thomas Capola
> <tcapola@porter-capital.com>
> > > > > wrote:
> > > > >
> > > > > > Lol, I'll buy u a hot dog.
> > > > > >
> > > > > > Thomas Capola
> > > > > > Managing Partner
> > > > > > Porter Capital LLC
> > > > > >
> > > > > > -----Original Message-----
> > > > > > From: Paulo Melo
> > [mailto:paulsoc17@yahoo.com]
> > > > > > Sent: Thursday, December 07, 2006 4:14 PM
> > > > > > To: tcapola@porter-capital.com
> > > > > > Subject: RE: website...
> > > > > >
> > > > > > Thanks???? we'll discuss payment later
> > > chief...
> > > > > > -Paulo
> > > > > >
> > > > > > --- Thomas Capola
> > <tcapola@porter-capital.com>
> > > > > > wrote:
> > > > > >
> > > > > > > Cool, thanks...
> > > > > > >
> > > > > > > Thomas Capola
> > > > > > > Managing Partner
> > > > > > > Porter Capital LLC
> > > > > > >
> > > > > > > -----Original Message-----
> > > > > > > From: Paulo Melo
```

3

## Capola, Angelica

| | |
|---|---|
| **From:** | Paulo Melo [paulsoc17@yahoo.com] |
| **Sent:** | Friday, December 08, 2006 11:33 AM |
| **To:** | Capola, Angelica |
| **Cc:** | Thomas Capola |
| **Subject:** | RE: website... |

Oh ye i know. This whole office is shady. Manager living with employees, Z colelcting
while others can't. I mean there is some shit going on here...and the name on the loan
worksheet is southeastern mortgage partners..so it it that company.
-Paulo

--- "Capola, Angelica" <Angelica.Capola@lehman.com>
wrote:

>
> I do know also that the trio and prob Chris collect on fees from deals
> VCC also funds...that is illegal...can't collect on deals you fund...
>
> -----Original Message-----
> From: Paulo Melo [mailto:paulsoc17@yahoo.com]
> Sent: Friday, December 08, 2006 11:16 AM
> To: Capola, Angelica
> Cc: Thomas Capola
> Subject: RE: website...
>
> Well, i know for a fact that we are funding through Velocity because
> zach charged 3.25% origination fee on this loan and everyone in the
> office was pissed because he can and we can't. So i know itd being
> funded through Velocity. I just think that zach has side deal with all
> these correspondece where he collects from them and sends them deal we
> can't do...
> -Paulo
>
> --- "Capola, Angelica" <Angelica.Capola@lehman.com>
> wrote:
>
> >
> > Are you sure they're funding through VCC?  Or are
> they having VCC
> > employees do the work and then sending it to
> Southeastern guys to fund
> >
> > the loan with all the completed paperwork?  Do
> they have separate loan
> >
> > sheets for their Southeast Mortgage Partners
> deals?
> > Or do they just kick
> > deals over to lenders and collect a fee just for
> passing the loan on
> > to them?  Do you know how it's working out?
> >
> > -----Original Message-----
> > From: Paulo Melo [mailto:paulsoc17@yahoo.com]
> > Sent: Friday, December 08, 2006 11:07 AM
> > To: Capola, Angelica
> > Cc: Thomas Capola
> > Subject: RE: website...
> >
> > But VCC is getting paid on them...Its just our
> loan worksheet...They
> > are funding the loan through velocity...

1

# EXHIBIT 4

-----Original Message-----
From: Angelica.Capola@lehman.com
To: firelady090803@aol.com
Sent: Fri, 3 Nov 2006 1:37 PM

So I take it now no one is coming tomorrow?  I hear that Neil is now
telling them Tom is 1000% guilty of embezzling.  It's ridiculous.

When it's all settled, I told Tom to demand that a letter of retraction
goes around VCC.  This is abhorrent.  Tom is NOT guilty of embezzlement.
I told him to request a polygraph.  Those were NOT the feds.  Are people
in that office that stupid to believe Neil?

------------------------------------------------------------------------------
This message is intended only for the personal and confidential use of the
designated recipient(s) named above.  If you are not the intended recipient of

-----Original Message-----
From: Angelica.Capola@lehman.com
To: firelady090803@aol.com
Sent: Fri, 3 Nov 2006 1:57 PM
Subject: RE:

I really am so disappointed that people believe Neil. He is lying, saying they're Feds, etc. That tom def
embezzled, etc. Tom was not charged and this is all pending and it will be cleared. Wish I could call Jeff and
say, "No one has been charged with anything, why is Neil going around slandering Tom without a fair shot?"

And the worst is, he didn't do anything.

## Capola, Angelica

**From:** firelady090803@aol.com

**Sent:** Tuesday, October 31, 2006 3:22 PM

**To:** Capola, Angelica

**Subject:** email

Just wanted you to see what we received today.

As most of you know, Thomas Capola has been suspended from his position at Velocity Commercial pending the outcome of an ongoing inquiry. During the period of Thomas' suspension, Neil Beldock will be the acting manager of the Connecticut office, and will be responsible for all of Thomas' former responsibilities. During this period, the Company expects everyone to give their full cooperation to Neil, as well as to the attorneys the Company has retained to represent Velocity Commercial regarding the suspension of Thomas.
If you have any questions, please feel free to ask either Neil or me. Thank you

**Check out the new AOL.** Most comprehensive set of free safety and security tools, free access to millions of high-quality videos from across the web, free AOL Mail and more.

Gmail - Info                                                    http://mail.google.com/mail/?ik=a8bf62f0a2&view=pt&th=10ec7b0...



**Thomas Capola <speedwobble@gmail.com>**

# Info
7 messages

**Paula Lazarus <plazarus60@gmail.com>**                       **Tue, Nov 7, 2006 at 10:24 AM**
To: Thomas Capola <speedwobble@gmail.com>

just wanted to let you know that Chris told Barbara that you are in a lot of trouble. I told Barbara he may have said that because he doesn't know where her loyalties lie and doesn't want to say to much to her. Since she can't talk to you herself she asked me to let you know.

Also, she is going to take a couple of sick days but then she's not going to go back

need to talk with the lawyers today

## Capola, Angelica

| | |
|---|---|
| **From:** | firelady090803@aol.com |
| **Sent:** | Tuesday, October 31, 2006 10:41 AM |
| **To:** | Capola, Angelica |
| **Subject:** | Re: It's Paula |

**Attachments:** VCC Phone List 10-06-06.xls; Phone List Final as of 10.26.2006.xls

I attached both the one for just this office and the company one.

This morning Neil made an announcement that this investigation involves things that are pre velocity and that the company is not going to close.

However, he also had me write up a deposit but told me not to scan it and send it to Mark Levine like I always do. So I scanned it anyway and sent it to myself at home.

-----Original Message-----
From: Angelica.Capola@lehman.com
To: firelady090803@aol.com
Sent: Tue, 31 Oct 2006 9:28 AM
Subject: RE: It's Paula

can you send me the company directory, need some cell numbers ... thanks, P

**From:** firelady090803@aol.com [mailto:firelady090803@aol.com]
**Sent:** Tuesday, October 31, 2006 8:01 AM
**To:** Capola, Angelica
**Subject:** Re: It's Paula

Hi Angelica,

First of all my cell number is ███████████ and it is always on. Second, immediately after Neil made his announcement I told Barbara this was because of Thomas and Chris pushing Neil out and trying to get Zach to do things the "Company Way". The only questions I know have been asked are about Dan Koenig the summer intern we had here and something about a server, which by the way is now missing from the closet.

Neil was in the office when I arrived at 7:45 and was going through things in Thomas' office. Thomas knows I neither trust of like Neil, Zach or Hannah and I will be business like towards them because I have to. I feel this was done the way it was to try to discredit Thomas in the eyes of the people in this office but I for one will never believe Thomas or Chris did anything wrong. I have had many conversations with Thomas about the way he runs a business and I know this is just because someone (Neil, Zach & Hannah) can not get their own way with him and are trying to cause trouble.

I have copied an email we all received late last night from Jeff Taylor, I thought you and Thomas would like to know what was said.

If you could keep me informed as to whats going on I would appreciate it.

Paula

# EXHIBIT 5

**PGKM** | **PILIERO**
| **GOLDSTEIN**
| **KOGAN &**
| **MILLER, LLP**

Michael C. Miller
212-478-8525 PH
212-478-8526 FX
mimiller@pgkm.com

December 13, 2006

**BY HAND**

Thomas Capola
c/o Jason Pickholz
Akerman Senterfitt
335 Madison Avenue, Suite 2600
New York, NY 10017-4636

### Re:   Velocity Commercial Capital, LLC ("Velocity Commercial")

Dear Mr. Capola:

I am writing to you on behalf of Velocity Commercial to advise you that Velocity Commercial is terminating your employment for cause, effective the date of this letter. The decision to terminate you for cause is based, in part, on the results of an internal investigation conducted by Velocity Commercial starting in October 2006, as well as based on your conduct since you were suspended from employment on October 30, 2006.

Specifically, during the course of its investigation, Velocity Commercial has learned that, among other things, during the period from May to August 2006, you directed and caused an intern of Velocity Commercial, Daniel Koenig, to perform work at your home for your personal benefit during time he was supposed to have been working for Velocity Commercial. Velocity Commercial's investigation has also established that you facilitated the submission of Mr. Koenig's time sheets and that Velocity Commercial paid Mr. Koenig for eight hours per day during the entire May to August time period at issue even though he was, at your direction, devoting some or all of the time billed to Velocity Commercial, working at your home exclusively for your personal benefit. In addition, when I interviewed you regarding this matter on Monday, October 30, 2006, you initially misrepresented to me that you had no knowledge of Mr. Koenig ever performing any work for you outside of the scope of Velocity Commercial's business. In addition, when pressed, you subsequently refused to answer questions regarding whether Mr. Koenig had in fact performed work for you at your home while he was supposed to be working at Velocity Commercial.

Separately, upon your suspension by Velocity Commercial on October 30, 2006, I specifically instructed you not to contact any Velocity Commercial employees while you were suspended. I also specifically directed you not to remove any electronic

00033699.3 V023042.0001

Thomas Copola
December 13, 2006
Page 2

equipment or other documents or data from the premises of Velocity Commercial's
Stamford offices. You specifically acknowledged that you understood those instructions
and stated that you agreed to comply. Nevertheless, and as you have subsequently
admitted, Velocity Commercial has learned that not only did you contact at least one of
its employees less than ten minutes after leaving its offices following our meeting, but
you also caused that employee to remove a computer from Velocity Commercial and
bring it to you in the parking garage below its offices. Velocity Commercial also has
learned that approximately one week after your suspension you held a meeting at your
house with current Velocity Commercial employees in an attempt to solicit them to join
your own competing business that you planned to form after your termination.

Beyond violating the terms of your suspension, given your acknowledged
awareness of the subpoena issued to Velocity Commercial by the U.S. Securities and
Exchange Commission, your improper removal of a computer from its offices has also
intentionally impeded Velocity Commercial's ability to completely comply with that
subpoena. Moreover, Velocity Commercial has learned that on October 30, 2006 you
deleted in excess of six thousand electronic files on the computer that you had
intentionally removed from Velocity Commercial's offices and deleted additional files
thereafter. Some of these documents appear responsive to the SEC's subpoena. Your
purposeful destruction of data occurred prior to and after our meeting with you that
morning and after our explicit admonition that you refrain from removing any electronic
files from Velocity Commercial's office. Your deliberate conduct has jeopardized
Velocity Commercial's ability to comply with the subpoena that the U.S. Securities and
Exchange Commission served upon it and clearly constitutes serious misconduct as well
as a significant breach of fiduciary duty.

As a result these and other breaches of fiduciary duties and also as a result of your
intentional effort to induce others to breach their respective fiduciary duties to Velocity
Commercial, I also take this opportunity to remind you of your continuing fiduciary duty
to not improperly utilize any of Velocity Commercial's confidential or proprietary
information that you may possess, as well as your legal duty not to tortiously interfere
with Velocity Commercial's contracts and/or prospective advantages with its employees,
clients and other people or entities.

The foregoing does not constitute an exhaustive list of your acts constituting
cause for termination. Moreover, Velocity Commercial specifically reserves all of its
rights of any nature whatsoever in connection with your conduct.

Thomas Copola
December 13, 2006
Page 3

You will receive, by separate letter, notification regarding continuation of your
health benefits in accordance with applicable law, and the return of your personal
property.

Sincerely yours,

Michael C. Miller

cc:     Jason Pickholz, Esq. (by Hand)

# EXHIBIT 6

--

TBC

**Rob Bamberg <rob.bamberg@occi.biz>**
Reply-To: rob.bamberg@occi.biz
To: Thomas Capola <speedwobble@gmail.com>

Wed, Jan 24, 2007 at 8:36 PM

Thomas

If you remember, the [illegible] ... turned it was and drive containing the [illegible] ... pictures are not affected [illegible] ... based on the server where they were [illegible] ... if you do not have the master part [illegible].

I send your server drive [illegible] ... Once to try and decrypt the files [illegible] ... drive to try and create a boot set [illegible] ... In short, the pictures are still [illegible].

At the same time your disk [illegible] ... question of me to provide anything I had [illegible] ... office I can't even recover the file [illegible].

I call on a regular basis [illegible] ... would be more than happy [illegible].

I also received is on the [illegible] ... further.

Regards
Rob

**From:** Thomas Capola [mailto:                    ]
**Sent:** Wednesday, January 24, 2007 9:58 AM
**To:** rob.bamberg@occi.biz
**Subject:** Re: Check for New Server

[Quoted text hidden]

**Thomas Capola <speedwobble@gmail.com>**
Draft To: rob.bamberg@occi.biz

Thu, Jan 25, 2007 at 11:25 AM

if the server drives are intact, why can't we recover the data?  i am confused.  if the operating drive failed, can't they recover the password off of that drive and use it to de-crypt the data on the server drives?  and am i understanding u correctly when u say that the operating drive, and the old server are all at 300 main st?  please clarify.  lastly, is there any way, here in our great technological country, to recover my pictures??

secondly, chris farrar, VCC and several VCC employee's have received subpoenas from the SEC.  i am not, have not been in the past, and will not be in the future based on what i know, under any investigations, nor indictments, nor have i committed any crimes.  (see attahced SEC subpoena)

chris forged several employee signatures on partnerships which he controlled, and lied to investors, other company employees and myself.  additoanlly, it seems he had other arrangements with a select group of people wiht in the company thru which he was defrauding the company.

additonally, he owed me addtioanl wages and antoher 5% equity for building the connecticut office.  it is my belief that he threw me out of the company and tried to discredit me in an attempt to one, hide his actions, and two, blame for for his other misdoings.  he is personnaly pressed for money and i think the greed got the better of him

thus, i know they told u some small tales, but alas, it is mostly ficticious and will be merited out in court over the next 2 years.

in the mean time, i would really like to find a way to recover my pictures as this is personally devasting to me. i am disappointed that you transfered the data and only later realized things were not easily recoverable.

also, please send a paid recepipt wiht your companys's info on it for
[Quoted text hidden]

--

TBC

# EXHIBIT 7



Fort Lauderdale
Jacksonville
Los Angeles
Madison
Miami
New York
Orlando
Tallahassee
Tampa
Tysons Corner
Washington, DC
West Palm Beach

355 Madison Avenue
Suite 2600
New York, NY 10017
www.akerman.com
212 880 3800 *tel*   212 880 8965 *fax*

Suzan Jo*
212 880 3821 *direct tel*
212 905.6406 *direct fax*
suzan.jo@akerman.com

* Admitted in Florida; New York Admission
Pending

April 9, 2007

### BY FAX 212-478-8526 AND U.S. MAIL

Michael C. Miller, Esq.
Piliero Goldstein Kogan & Miller, LLP
10 East 53rd Street
New York, NY 10022

      Re:    Velocity Commercial Capital, LLC

Dear Mike:

Thank you for returning the items of Thomas Capola's personal belongings that we picked up from your offices on Friday, April 6, 2007. However, there are certain outstanding issues that need to be discuss.

You stated in your February 8, 2007 letter that Velocity had deleted all the data on the white server in Mr. Capola's office and had returned the server to Otis Computer. We have learned from Robert Bamberg that he has not received the server from Velocity. If the server is in your or Velocity's possession, on behalf of Mr. Capola, we request that you preserve the contents of the server. If the server has been "wiped," we request that you preserve any backup information, in whatever medium the information is stored.

Additionally, the following personal and/or non-Velocity related items have not been returned to Mr. Capola:

      1.    Porter Capital LLC check books and check receipts;
      2.    Khandha Capital Management LLC check books and check receipts;
      3.    One (1) HP19BII Business Consultant Calculator;
      4.    Folder with information regarding Impac Mortgage;

Michael C. Miller, Esq.
April 9, 2007
Page 2

---

5.    All CDs containing personal photos (the only one that had VCC info on it was in the removable DVD player);
6.    One (1) removable DVD recorder/player;
7.    One (1) 2G UBS card;
8.    One (1) Dell Desktop Workstation with all drives, memory cards, cables and associated hardware and software etc. (Velocity may keep the data);
9.    One (1) Bloomberg computer keyboard;
10.   One (1) Windows computer keyboard;
11.   One (1) Optical Mouse;
12.   One (1) Nokia phone charger; and
13.   Cables for Walkman Cradle.

Please arrange for these items to be returned to Mr. Capola as soon as possible. Should Velocity refuse to return any of the above-mentioned items, please provide us with an explanation of the reason(s) for Velocity's refusal.

Sincerely,

AKERMAN SENTERFITT LLP

Suzan Jo

cc:    Jason Pickholz, Esq.

# EXHIBIT 8

## Capola, Angelica

**From:** FireLady090803@aol.com

**Sent:** Tuesday, December 19, 2006 5:51 PM

**To:** Capola, Angelica

**Subject:** Re: (no subject)

Your absolutely right. He knew I wouldn't answer his questions because he knew how I felt about Neil. Also he had Juan there fooling around with Thomas' computer. How do they know he didn't delete those files. We know he looked at my emails. That was the only way he could have known that Thomas had me looking into out sourcing the server. Another reason Chris and Neil would want the 2 of us gone. If the server wasn't in house they couldn't have someone tamper with the contents.

All makes perfect sense from the outside. Please make sure you remind Thomas about the incident with my email. They had Juan looking at what Thomas and I were doing for a long time.

Talk to you soon.

Paula

## Capola, Angelica

**From:** FireLady090803@aol.com

**Sent:** Monday, December 18, 2006 4:45 PM

**To:** Capola, Angelica

**Subject:** Re: (no subject)

*I said Miller was an idiot from the beginning. Why would he have someone question me with Neil in the room when he knew how I felt about Neil. I told him the first time that I didn't trust him, Zach or Hannah and I felt they were behind all of this. I would't be surprised if this lawyer is in on all of it too and probably paid the expert to say that about Tom's computer. Thomas saved everything and so did I but mysteriously things vanished. Besides, they left his office unsecured and gave the 3 worst offenders keys to the kingdom. I wouldn't doubt if much much more was missing. Just like the day I was in there and the deposit slips and stamp had been moved. I knew where Thomas always kept them. I may have only worked for him for 6 months but I got to know him pretty well.*

*I hope they all go down, Miller included. As far as I'm concerned they are all dirty and should all go to jail.*

*I'm doing some seasonal temp work, not what I want to be doing but I need to work. Doesn't pay well and I'm wasting my talents but it's what I have to do for now.*

*Hope things get better for the 2 of you quickly. It's not fair that you have to go through this.*

*Hope you all have a nice holiday. You can feel free to call me anytime after 430 during the week or anytime on the weekend.*

*talk to you soon.*

*Paula*

**Sent:** Tuesday, October 31, 2006 8:01 AM
**To:** Capola, Angelica

Page 5 of 8

**Subject:** Re: It's Paula

Hi Angelica,

First of all my cell number is █████████ and it is always on. Second, immediately after Neil made his announcement I told Barbara this was because of Thomas and Chris pushing Neil out and trying to get Zach to do things the "Company Way". The only questions I know have been asked are about Dan Koenig the summer intern we had here and something about a server, which by the way is now missing from the closet.

Neil was in the office when I arrived at 7:45 and was going through things in Thomas' office. Thomas knows I neither trust of like Neil, Zach or Hannah and I will be business like towards them because I have to. I feel this was done the way it was to try to discredit Thomas in the eyes of the people in this office but I for one will never believe Thomas or Chris did anything wrong. I have had many conversations with Thomas about the way he runs a business and I know this is just because someone (Neil, Zach & Hannah) can not get their own way with him and are trying to cause trouble.

I have copied an email we all received late last night from Jeff Taylor, I thought you and Thomas would like to know what was said.

If you could keep me informed as to whats going on I would appreciate it.

Paula



# EXHIBIT 9

**Thomas Capola <speedwobble@gmail.com>**                    **Wed, Nov 8, 2006 at 8:43 AM**
To: Paula Lazarus <plazarus60@gmail.com>

yes, i agree.  and i learned yesterday that chris has not told the other board members things that are critical, so it seems he thought was to push me out and cover his tracks.  i am really, really pissed over this.

# EXHIBIT 10

LENDER:                          Velocity Commercial Capital, LLC

LENDER / FUNDING INSTRUCTIONS

Borrower: Kelly
Loan #: 3454578054

LOAN AMOUNT:            $945,000.00     *I thought we signed contracts*
INTEREST RATE:            7.750%         *not to collect origination fee!*
AMORTIZATION:             360

| Deductions from Loan Amount: | | | | | | | |
|---|---|---|---|---|---|---|---|
| PREPAID/ SHORT INTEREST: | $ | (1,830.96) | | Interest at | $ | 203.44 per day | |
| LENDER ORIGINATION FEE: | $ | (2,362.50) | | Dates: from | | 2/20 to 3/1 | |
| LENDER ADMIN FEE: | $ | (108.16) | | (estimated disbursement date) | | | |
| LENDER RATE BUYDOWN: | $ | (18,900.00) | | | | | |
| LENDER UNDERWRITING FEE: | $ | (2,000.00) | | | # of Days = | 9 | |
| BORROWER'S GFD: | $ | 512.00 | | *who keeps the extra $500.00?* | | | |
| LENDER DOC FEE: | $ | (550.00) | | | | | |
| ENVIRONMENTAL INSURANCE: | $ | (1,547.63) | | | | | |
| TAX SERVICE CONTRACT: | $ | (110.00) | | | | | |
| PROPERTY TAX IMPOUND | $ | (585.93) | 1 | Months at | $ | 585.93 per month | |
| INSURANCE IMPOUND | $ | (800.00) | 4 | Months at | $ | 200.00 per month | |
| OTHER FEES: | $ | · | | | | | |
| SRP from Velocity to Broker: | $ | 2,362.50 | | | | | |
| Appraisal Fee $2988.00 POC | $ | · | | | | | |
| | $ | · | | | | | |
| | $ | · | | | | | |
| | $ | · | | | | | |
| | $ | · | | | | | |
| | $ | · | | | | | |
| | $ | · | | | | | |
| | $ | · | | | | | |
| AMOUNT OF WIRE: | $ | 919,079.32 | | | | | |

| OTHER FEES: | | |
|---|---|---|
| ORIGINATION FEE TO BROKER: | $ | 5,906.25 |
| Origination fee to Interbank: | | $9,450 |
| PROCESSING FEE TO BROKER: | $ | 1,000.00 |

PLEASE BE ADVISED THAT LENDER REQUIRES SIGNED LOAN DOCUMENTS IN
OUR OFFICE 48 HOURS PRIOR TO FUNDING IN ALL 50 STATES

_____
Kelly Gladstone/Molly Fritz, Settlement Agent

_____
Date

George T. Kelly
Borrower

_____
Lori Savoy-Kelly
Borrower

LENDER:                              Velocity Commercial Capital, LLC

                            LENDER / FUNDING INSTRUCTIONS

Borrower: Bellows
Loan #: 3454577930

LOAN AMOUNT:                  $308,750.00
INTEREST RATE:                  11.750%
AMORTIZATION:                     360

Deductions from Loan Amount:
PREPAID/ SHORT INTEREST:    $    (2,216.94)        Interest at        $    100.77  per day
LENDER ORIGINATION FEE:     $        -            Dates: from          2/7     to   3/1
LENDER ADMIN FEE:           $     (126.20)        (estimated disbursement date)
LENDER RATE BUYDOWN:        $        -
LENDER UNDERWRITING FEE:    $    (3,000.00)                        # of Days =    22
BORROWER'S GFD:             $        -
LENDER DOC FEE:             $     (750.00)
ENVIRONMENTAL INSURANCE:    $    (1,547.63)
TAX SERVICE CONTRACT:       $      (60.00)
PROPERTY TAX IMPOUND        $     (161.80)    1    Months at     $    161.80  per month
INSURANCE IMPOUND           $    (7,266.60)   9    Months at     $    807.40  per month
OTHER FEES:                 $        -
SRP from Velocity to Broker:  $    3,087.50
Appraisal Fee $3090 ($3000 POC)  $    (90.00)
FLOOD INSURANCE IMPOUND     $     (537.30)        3  Months at          $179.10  per month
                            $        -
                            $        -
                            $        -
                            $        -
                            $        -
                            $        -
AMOUNT OF WIRE:             $   296,081.03

OTHER FEES:
ORIGINATION FEE TO BROKER:
CREDIT REPORT Fee to BROKER:            $40

Pay Feb. Tax at closing:     $      970.76
Pay Flood Ins. Premium at closing:   $2,149.00  Payable to: State Farm Insurance Company
Pay Ins. Remaining Balance:          $3,269.68  Payable to: Futures Insurance Marketing
PLEASE BE ADVISED THAT LENDER REQUIRES SIGNED LOAN DOCUMENTS IN
OUR OFFICE 48 HOURS PRIOR TO FUNDING IN ALL 50 STATES

_Handwritten annotations:_ who Keeps the extra $1500.00 under writing fee should be $1,000.00 for loans Sub 500K

_____
Celia French, Escrow Officer

_____
Date

Harold J. Bellows
Borrower

_____
Phill M. Osbourn, Jr.

LENDER:                          Velocity Commercial Capital, LLC

LENDER / FUNDING INSTRUCTIONS

Borrower: Tobanche
Loan #: 3454577992

| LOAN AMOUNT: | $253,600.00 |
| INTEREST RATE: | 9.625% |
| AMORTIZATION: | 360 |

*Why can Zach charge origination fee and no one else can?*

| Deductions from Loan Amount: | | | | | | |
|---|---|---|---|---|---|---|
| PREPAID/ SHORT INTEREST: | $ | (1,559.40) | | Interest at | $ | 67.80 per day |
| LENDER ORIGINATION FEE: | $ | (2,536.00) | | Dates: from | 2/6 | to 3/1 |
| LENDER ADMIN FEE: | $ | (110.80) | | (estimated disbursement date) | | |
| LENDER RATE BUYDOWN: | $ | - | | | | |
| LENDER UNDERWRITING FEE: | $ | (1,000.00) | | | # of Days = | 23 |
| BORROWER'S GFD: | $ | - | | | | |
| LENDER DOC FEE: | $ | (550.00) | | | | |
| ENVIRONMENTAL INSURANCE: | $ | (1,547.63) | | | | |
| TAX SERVICE CONTRACT: | $ | (60.00) | | | | |
| PROPERTY TAX IMPOUND | $ | (184.40) | 1 | Months at | $ | 184.40 per month |
| INSURANCE IMPOUND | $ | (348.80) | 4 | Months at | $ | 87.20 per month |
| OTHER FEES: | $ | - | | | | |
| | $ | - | | | | |
| Appraisal Fee $2060 ($2000 POC) | $ | (60.00) | | | | |
| | $ | - | | | | |
| | $ | - | | | | |
| | $ | - | | | | |
| | $ | - | | | | |
| | $ | - | | | | |
| | $ | - | | | | |
| | $ | - | | | | |
| AMOUNT OF WIRE: | $ | 245,642.97 | | | | |

OTHER FEES:

| ORIGINATION FEE TO BROKER: | $17,752.00 |
| PROCESSING FEE TO BROKER: | $1,270 |
| Appraisal Reimbursement to Vision: | $2,000 |
| PAY NOV. TAX IF DUE | $1,106.86 |
| PAY APRIL TAX AT CLOSING | $1,106.86 |
| PAY INS. PREMIUM AT CLOSING | $1,047.00 Payable to Lupe Diaz Insurance Agency |

PLEASE BE ADVISED THAT LENDER REQUIRES SIGNED LOAN DOCUMENTS IN OUR OFFICE 48 HOURS PRIOR TO FUNDING IN ALL 50 STATES

LENDER                                Velocity Commercial Capital, LLC

                                   LENDER / FUNDING INSTRUCTIONS

Borrower: Tenorio
Loan #: 3454578076

LOAN AMOUNT:                   $    142,500.00
INTEREST RATE:                      10.125%
AMORTIZATION:                       360

Deductions from Loan Amount:
PREPAID/ SHORT INTEREST:       $      (641.28)          Interest at         $      40.08  per day
LENDER ORIGINATION FEE:        $         -             Dates: from          2/13    to   3/1
LENDER ADMIN FEE:              $      (104.80)          (estimated disbursement date)
LENDER RATE BUYDOWN:           $         -
LENDER UNDERWRITING FEE:       $    (1,500.00)                              # of Days =   16
BORROWER'S GFD:                $         -
LENDER DOC FEE:                $      (875.00)    who keeps the extra $500.00?
ENVIRONMENTAL INSURANCE:       $    (1,547.63)
TAX SERVICE CONTRACT:          $       (89.00)
PROPERTY TAX IMPOUND:          $      (180.00)   5   Months at         $       36.00  per month
INSURANCE IMPOUND:             $      (488.40)   3   Months at         $      162.80  per month
OTHER FEES:                    $         -
SRP from Velocity to Broker:   $     2,850.00
Appraisal Fee $2009 ($2000 POC) $        (9.00)
                               $         -
                               $         -
                               $         -
                               $         -
                               $         -
                               $         -
                               $         -
AMOUNT OF WIRE:                $   139,914.89

OTHER FEES:
ORIGINATION FEE TO BROKER:     $     2,850.00
PROCESSING FEE TO BROKER:            $500
UNDERWRITING FEE TO BRKR:      $     2,250.00
CREDIT REPORT FEE TO BRKR:     $       62.00
INSPECTION FEE TO BRKR:        $       75.00
PAY INS. PREMIUM AT CLSING:    $     1,954.00  $150 for Ins. Application and Inspection fees
PLEASE BE ADVISED THAT LENDER REQUIRES SIGNED LOAN DOCUMENTS IN
OUR OFFICE 48 HOURS PRIOR TO FUNDING IN ALL 50 STATES


Antonio Chavez, Settlement Agent                Angel Payran Tenorio
                                                Borrower

Date